**Edna Emerson LITTLEWOLF, et al., Plaintiffs,**

**v.**

**Donald Paul HODEL, et al., Defendants,**

**and**

**State of Minnesota, et al., Defendant–Intervenors.**

**Civ. A. No. 87–822.**

United States District Court, District of Columbia.

March 17, 1988.

---

Robert C. Odle, Jr., Alan J. Weinschel, R. Bruce Rich, Steven C. Schwartz, and Melissa G. Salten, Weil, Gotshal & Manges, Washington, D.C., Michael D. Ratner, David Cole, and Mahlon Perkins, Center for Constitutional Rights, New York City, for plaintiffs.

Edward J. Passarelli, U.S. Dept. of Justice, Land and Natural Resources Div., Washington, D.C., Michael D. Cox and Mariana Shulstad, Office of the Sol., U.S. Dept. of Interior, and on brief, F. Henry Habicht, II, Asst. Atty. Gen., and Roger J. Marzulla, Acting Asst. Atty. Gen., Washington, D.C., for defendants.

James M. Schoessler, Asst. Atty. Gen., William A. Szotkowski, Sp. Asst. Atty. Gen., and, on brief, Hubert H. Humphrey, III, Atty. Gen., State of Minn., St. Paul, Minn., for defendant-intervenor State of Minn.

Bruce J. Terris and Kathryn A. Bleecker, Terris, Edgecombe, Hecker & Wayne, Washington, D.C., Charles K. Dayton and Nancy Wiltgen Reibert, Pepin Dayton Herman & Graham, Minneapolis, Minn., for defendants-intervenors Becker, Clearwater and Mahnomen Counties.

## INTRODUCTION

CHARLES R. RICHEY, District Judge.

In this case, plaintiffs, twenty-two members of the White Earth Band of Chippewa Indians, seek a judgment declaring that the White Earth Reservation Land Settlement Act of 1985 ("the White Earth Act" or "the Act") is unconstitutional. In the alternative, plaintiffs ask the Court to find that the defendants have failed to abide by certain trust obligations owed to plaintiffs; if the Court so finds, they also ask the Court to order defendants to perform those duties before taking any further action under the White Earth Act.

Plaintiffs have asked for a preliminary injunction and for summary judgment on their claims. In addition, they seek certification of a class, pursuant to Fed.R.Civ.P. 23(b)(2), consisting of "all Indians whose claims to land on the White Earth Reservation have been adversely affected by the White Earth Reservation Land Settlement Act." *Plaintiffs' Motion for Class Certification*, at 2. Defendants oppose the plaintiffs' motions and also ask the Court

to dismiss the action, a motion that the Court will treat as one for summary judgment, pursuant to Fed.R.Civ.P. 12(b).[1] Defendant-intervenors ask for summary judgment in their favor.

Due to exigencies of time, the Court combined a hearing on the preliminary injunction with a hearing on the defendants' and defendant-intervenors' motions and a hearing on the merits. The Court has also heard from the parties on the class certification motion. After carefully considering the arguments advanced in Court, the voluminous memoranda and exhibits submitted by the parties and intervenors, and the underlying law, the Court will grant plaintiffs' motion for class certification. The Court will also, however, grant defendants' and defendant-intervenors' motions for summary judgment.

## AS THERE ARE NO MATERIAL FACTS IN DISPUTE, SUMMARY JUDGMENT IS APPROPRIATE.

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The facts in this case are undisputed and are necessary background to the legal analysis that follows.

Through a series of treaties culminating in the White Earth Treaty of 1867, 16 Stat. 719, the Chippewa Indians ceded most of their lands in Minnesota in exchange for certain payments and establishment of the 830,000–acre White Earth Reservation. Under the General Allotment Act of 1887 (better known as the Dawes Act) and the Nelson Act of 1889, Congress established and applied to the Chippewa Indians a system for converting this and other reservation land to individual ownership; the Acts also provided that the United States would hold each individually allotted parcel in trust for a period of time. Subsequent statutes and Executive Orders so extended this trust period that the trust has never terminated. *See Indian Reorganization Act of June 18, 1934*, 25 U.S.C. § 462; *Act of June 25, 1910*, 36 Stat. 855 (codified at 25 U.S.C. 372); *Nelson Act of 1889*, 25 Stat. 642; *General Allotment Act of 1887*, 24 Stat. 388; *Executive Orders Nos. 5953 (1932), 5768 (1931), 4642 (1927)*.

Seemingly in disregard of this trust obligation, Congress enacted the Clapp Amendment of 1906, which removed all restrictions on alienation of land allotments to adult "mixed blood" members of the White Earth Band of Chippewa and authorized the Secretary of the Interior to grant unrestricted fee simple land patents to sufficiently competent adult full-blood Chippewa. 34 Stat. 353. As a result, these lands no longer enjoyed the tax-exempt status of properties held in trust by the federal government. *See Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912). State and local governments began to tax the allotted properties, many of which were lost through tax forfeitures. *See State v. Zay Zah*, 259 N.W.2d 580 (Minn.1979), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978).

In 1979, the Minnesota Supreme Court held that an Indian's vested right to freedom from taxation on allotments held in trust by the United States could not be altered by the Clapp Amendment and, therefore, the tax forfeiture of plaintiff's allotment was invalid. *Id.* This decision clouded title to vast areas of Minnesota land. In response to this untenable situation, Congress enacted the White Earth Reservation Land Settlement Act of 1985. *See, e.g.*, Pub.L. 99–264 § 2, 100 Stat. 61 (hereafter "White Earth Act"); S.Rep. 192, 99th Cong. 1st Sess. 1 (1985).

Under this Act, the land claims of White Earth Indians who do not choose to sue for the land itself are extinguished in exchange for compensation at a rate specified in the

---

1. Defendants did not rest on the complaint but submitted material outside the pleadings. As the Court will consider that material, the Court will treat defendants' motion as one for summary judgment, rather than a motion to dismiss the complaint for failure to state a claim. Fed. R.Civ.P. 12(b). *See Appendices to Memorandum of Supporting Authorities in Opposition to Plaintiffs' Motion for Summary Judgment and in Reply to Opposition to Motion to Dismiss.*

Act. *See* White Earth Act, § 8. The Act also provides a statute of limitations for suits by allottees seeking to recover the actual land allotments. These suits must be brought within 180 days after the Act's enactment (*i.e.*, October 24, 1986) or before the Secretary of the Interior publishes a Certification that certain events have occurred,[2] whichever is later.

## THE COURT MUST GRANT PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

Pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2), plaintiffs have moved to certify a class consisting of "all Indians whose claims to land on the White Earth Reservation have been adversely affected" by the White Earth Act. *Plaintiffs' Motion for Class Certification*, at 2. The Court must grant this motion.

Under Fed.R.Civ.P. 23, a party may bring a class suit if the class is so numerous that joinder is impracticable, there are common questions of law or fact, the parties' claims are typical of the class claims, and the representative parties will fairly and adequately protect the interest of the class. A party seeking certification under Fed.R.Civ.P. 23(b)(2) must also be able to show that those opposing the class acted or refused to act on "grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Plaintiffs satisfy these criteria.

No party disputes plaintiffs' contention that several thousand members of the White Earth Band may have a land claim that is affected by the White Earth Act. Accordingly, plaintiffs more than meet the test for numerosity of class members. *See, e.g., E.E.O.C. v. Printing Industry, Inc.*, 92 F.R.D. 51, 53 (D.D.C. 1981). Similarly, there is no dispute that plaintiffs'

claims revolve around questions of law that will affect all members of the potential plaintiff class. As such, plaintiffs satisfy the "common questions of law or fact" inquiry. *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979); 1 *Newberg on Class Actions* § 3.10 (1985).

Since the parties agree that injunctive and declaratory relief are the only remedies that the Court could issue in this case, the sole areas of controversy concern whether plaintiffs raise claims typical of those of the absent class members and whether plaintiffs will adequately represent the absentees. Despite the strenuous protests of defendants and defendant-intervenors, the Court finds that plaintiffs satisfy these requirements as well.

■ The typicality requirement ensures that the claims of the representative and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class. *See* 7A C.A. Wright, A. Miller & M.K. Kane, *Federal Practice and Procedure: Civil* § 1764. When, as here, the representatives and the absent class members would proceed on the same legal theory and would raise claims arising from the same event or course of conduct, the class members are deemed to be raising claims "typical" of those of the class as a whole. *Id.; see also Streicher v. Prescott*, 103 F.R.D. 559, 561 (D.D.C. 1984); 1 *Newberg on Class Actions* § 3.13.

■ Defendants and defendant-intervenors maintain that plaintiffs fall short of the typicality requirement because the named plaintiffs do not allege that they represent every possible category of land claimant. In addition, they argue that plaintiffs impermissibly rely on their racial identity with other White Earth members as proof of their typicality. Defendants

---

**2.** Under the Act, the Secretary must publish a certification that (1) the State of Minnesota has agreed to transfer 10,000 acres to the United States in trust for the White Earth Band of Chippewa Indians; (2) the State has appropriated $500,000 for technical and computer assistance for implementing the land claims settle-

ment; and (3) the United States has appropriated $6.6 million for economic development for the benefit of the White Earth Band. White Earth Act, §§ 6(a), 10. Plaintiffs filed their motion for a preliminary injunction after learning that the Secretary will imminently publish this Certification.

and defendant-intervenors misapprehend the nature of the plaintiffs' case.

The types of land claims plaintiffs could allege in an action to recover allotted land are utterly irrelevant to this suit. Here, plaintiffs ask the Court to consider the constitutionality of a statute governing all White Earth Band land claims, or, in the alternative, to force the United States to carry out certain trust duties before those land claims may be settled or vindicated. As any person who has a claim under the statute could lodge this exact suit, factual distinctions between the underlying claims have no bearing on the named plaintiffs' "typicality." *See, e.g., Wagner v. Taylor,* 836 F.2d 578, 591 (D.C.Cir.1987); *Pratt v. Heckler,* 629 F.Supp. 1496, 1503 (D.D.C. 1986).

Similarly, defendants and defendant-intervenors wrongly suggest that the named plaintiffs rely solely on their racial heritage as proof of the similarity of their claims to those of other White Earth Band members. This is not so. Rather, plaintiffs bring claims that are closely related, in cause and legal theory, to the claims that could be asserted by any individual affected by the White Earth Act. Plaintiffs' racial heritage is neither the ground of their legal claim nor a fact underlying that claim. As such, the law's proscription against the use of racial identity to support a finding of typicality is not relevant to this case. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 2371 n. 15, 72 L.Ed.2d 740 (1982).

Finally, plaintiffs must prove that they "fairly and adequately" represent the proposed class. This requirement incorporates two principal criteria: " '1) the named representative[s] must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representatives must appear able to vigor-

ously prosecute the interests of the class through qualified counsel.' " *National Association for Mental Health, Inc. v. Califano,* 717 F.2d 1451, 1458 (D.C.Cir.1983), *cert. denied sub nom. Wagshal v. Crozer–Chester Medical Center,* 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984) (*quoting National Association of Regional Medical Programs, Inc. v. Mathews,* 551 F.2d 340, 345 (D.C.Cir.1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977); *Arnett v. American National Red Cross,* 78 F.R.D. 73, 75 (D.D.C.1978). Defendants and defendant-intervenors argue that there may be members of the White Earth Band who are satisfied with the remedies available under the White Earth Act and would not challenge the Act's constitutionality. As such, they maintain, plaintiffs do not meet the "adequacy of representation" test.[3]

Basic considerations of fairness require the Court to undertake a searching inquiry into the adequacy of representation, for any representation that falls short of the standard may well infringe the due process rights of absent class members. *See, e.g., Hansberry v. Lee,* 311 U.S. 32, 45, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *National Association for Mental Health, Inc. v. Califano,* 717 F.2d at 1457. This inquiry must be especially careful in a motion for class certification under Fed.R.Civ.P. 23(b)(2), as members cannot "opt out" of a class certified under that provision of the rule. *See Federal Practice and Procedure,* § 1793.

The Court is satisfied that class certification is proper in this case. While actual antagonism between class members, or a "strong likelihood" of antagonism, would defeat class certification, *see, e.g., Fink v. National Savings & Trust Co.,* 772 F.2d 951, 965 (D.C.Cir.1985) (Scalia, J., concurring in part and dissenting in part); *Phillips v. Klassen,* 502 F.2d 362, 366–67 (D.C.

---

3. Neither defendants nor defendant-intervenors challenge the qualification of plaintiffs' counsel, who are able and experienced members and associates of the law firm of Weil, Gotshal & Manges as well as equally able and experienced counsel associated with the Center for Constitutional Rights. Plaintiffs' counsel are fully able to prosecute this suit with as much vigor, will-

ingness, and competence as the Court could wish of any class counsel. As such, they thoroughly satisfy the Rule 23(a)(4) requirements. *See, e.g., National Association for Mental Health, Inc. v. Califano,* 717 F.2d 1451, 1458 (D.C.Cir. 1983), *cert. denied sub nom. Wagshal v. Crozer–Chester Medical Center,* 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984).

Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974), incantations of the *potential* for antagonism are insufficient. As defendants have not even attempted to show that there is *any* likelihood that class members have antagonistic interests, the Court cannot be persuaded by defendants' arguments. *See Robbins v. Kleindienst,* 383 F.Supp. 239, 241 (D.D.C. 1974).[4]

■ Defendants and defendant-intervenors have advanced one additional argument against class certification. They argue that, because plaintiffs seek either injunctive relief or relief that is (allegedly) beyond the Court's authority to order, class certification is unnecessary and should be denied. The Court cannot agree with this line of reasoning.

Defendants and defendant-intervenors have cited, and the Court is aware of, many cases (although none from the Court of Appeals for this Circuit) holding that class certification may be denied if "unnecessary." *See, e.g., Galvan v. Levine,* 490 F.2d 1255, 1261 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct 2652, 41 L.Ed.2d 240 (1974); *Gray v. International Brotherhood of Electrical Workers,* 73 F.R.D. 638, 640–41 & n. 5–7 (D.D.C.1977). These cases are far from dispositive, since, "[l]ike Newton's Law of Thermodynamics, for every class denial on the basis of lack of need, one is able to find a decision, or several decisions, often in the same circuit, where other courts have certified Rule 23(b)(2) classes under virtually the same circum-

stances." 1 *Newberg on Class Actions* § 4.19; *see also Ridgeway v. International Brotherhood of Electrical Workers,* 74 F.R.D. 597, 601 (N.D.Ill.1977) (necessity requirement a "minority approach").

Indeed, the Court is confident that certification under Rule 23(b)(2) is proper regardless of need or the lack thereof. Rule 23(b)(2) specifically makes the class suit device available when only injunctive relief is sought. Were class certification inappropriate if "unnecessary," it would be inappropriate whenever only injunctive relief is sought, as the proposed relief would apply to all persons, whether class members or not. Thus, the idea that a class may be certified only if "necessary" flies in the face of the Federal Rules. *See* Note, *The "Need Requirement": A Barrier to Class Actions Under Rule 23(b)(2),* 67 Geo.L.J. 1211 (1979).

Moreover, it is not clear that the necessity argument favors defendants and defendant-intervenors. Plaintiffs have asked, if the Court upholds the constitutionality of the White Earth Act, that the Court order the federal defendants to perform their alleged trust obligations to plaintiffs before certain of the Act's provisions take effect. As this relief would apply only to trust obligations owed plaintiffs, the absentees could not benefit from the order unless the class were certified. Hence, certification would be "necessary" for the absent members of the plaintiff class to benefit from the alternative relief sought.

---

4. As such, this case is fully distinguishable from two earlier cases in this circuit that may appear to cast doubt upon class certification in the face of claimed antagonism among class members. In both *Phillips v. Klassen,* 502 F.2d 362 (D.C. Cir.1974), and *Melong v. Micronesian Claims Commission,* 643 F.2d 10 (D.C.Cir.1980), there was evidence in the record suggesting that at least some class members were satisfied with the challenged law or practice. *See Melong v. Micronesian Claims Commission,* 643 F.2d at 15 n. 7. There is not even a hint of such evidence in this case.

Moreover, some courts, relying on the theory that conflicting interests are important only because they suggest that some class members are inadequately represented, have held that the problem is overcome when *any* party to the suit

espouses the conflicting point of view. Under those cases, if the absentees' views will be fully represented by *some* party—even if by an opposing party—the absentees' interests are protected and the conflict does not defeat class certification. *See Dierks v. Thompson,* 414 F.2d 453, 456–57 (1st Cir.1969); *Stotz v. United Brotherhood of Carpenters & Joiners,* 620 F.Supp. 396, 405 (D.Nev.1985); *Sturdevant v. Deer,* 73 F.R.D. 375, 378 (E.D.Mich.1976); *Rota v. Brotherhood of Railway, Airline & S.S. Clerks,* 64 F.R.D. 699, 706 (N.D.Ill.1974); *see also* 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 1768 (1986). Because these authorities are at odds with both Rule 23 and traditional notions of alignment of parties and interests, the Court will not rely on them.

■ Defendants argue that the Court has no power to order such relief and, therefore, the requested alternative relief offers no ground for class certification. But the propriety of class certification does not depend on the merits of the underlying suit; all the Court may consider is whether the movant has met the requirements of Rule 23. *See, e.g. Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). Defendants' argument, therefore, fails to bolster its opposition to class certification.

In sum, plaintiffs satisfy the criteria for class certification. The Court will therefore grant the motion to certify a plaintiff class consisting of all members of the White Earth Band who were adversely affected by the White Earth Land Settlement Act of 1985.

### Plaintiffs' Constitutional Challenges to the White Earth Act

Plaintiffs have raised several challenges to the constitutionality of the White Earth Act. Specifically, plaintiffs claim that the Act violates their due process rights by failing to afford them an adequate opportunity to bring a land claims suit and by forcing them to elect between bringing a land claims suit and seeking a remedy under the Act. They also claim that members of the plaintiff class have received inadequate notice of their right to bring land claim suits, which plaintiffs maintain violates their due process rights and the government's trusteeship obligations. Plaintiffs further argue that the White Earth Act effects a taking of property without just compensation, in violation of the Fifth Amendment, and they maintain that the Tucker Act remedy provided by the statute does not remedy this constitutional infirmity.

■ The Court will address each of plaintiffs' arguments in turn. As an initial proposition, however, the Court must note the heavy burden plaintiffs face in their challenge to the constitutionality of a federal statute. From the legislative history, it is clear that Congress was quite concerned with the constitutionality of the White Earth Act and passed the legislation

only after satisfying itself that all portions of the Act were constitutional. *See, e.g.,* Cong.Rec. S17589 (daily ed. Dec. 13, 1985); Cong.Rec. S17490 (daily ed. Dec. 12, 1985). In such a situation, deference to the Congressional enactment is particularly appropriate:

> The Congress is a coequal branch of government whose Members take the same oath [as members of the judiciary] to uphold the Constitution of the United States. As Justice Frankfurter noted in *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 164 [71 S.Ct. 624, 644–45, 95 L.Ed. 817] (1951), we must have 'due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government.' The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality.

*Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981); *see also Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 568, 67 S.Ct. 1409, 1419, 91 L.Ed. 1666 (1947).

With this principle firmly in mind, the Court will now consider each of plaintiffs' constitutional challenges.

### A. The White Earth Act statute of limitations does not violate the Constitution.

■ As an initial point, the Court notes that, in general, Congress may impose a constraint or duty on vested property rights if its action is rationally related to a legitimate governmental interest. *See, e.g., United States v. Locke,* 471 U.S. 84, 104, 105 S.Ct. 1785, 1798, 85 L.Ed.2d 64 (1985); *Mills v. Habluetzel,* 456 U.S. 91, 100–01, 102 S.Ct. 1549, 1555–56, 71 L.Ed.2d 770 (1982); *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 83–85, 98 S.Ct. 2620, 2635–37, 57 L.Ed.2d 595 (1978). This principle changes slightly in the Indian law context, as federal action

toward Native Americans must be construed in light of the government's generalized trust responsibility toward them. *See, e.g., Cohen's Handbook on Indian Law* 220–21 (1982). Because of this trust responsibility, legislation must be "tied rationally" to a legislative effort *to protect and serve the interests of Native Americans. Id.* at 221; *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483–84, 41 L.Ed.2d 290 (1974); *Seminole Nation v. United States,* 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942).

▇▇▇▇ Although plaintiffs have advanced a host of challenges to the White Earth Act's statute of limitations, the Court must find that the Act's limitations period is rationally related to the government's legitimate interest in protecting thousands of Indian claimants from the need to litigate thousands of expensive, time-consuming individual actions to recover any compensation for their claims. It matters not that the Act affects vested property rights; " 'legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.' " *United States v. Locke,* 471 U.S. at 104, 105 S.Ct. at 1797–98 (*quoting Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976)). As this principle applies even to legislation affecting federal trust responsibilities to Native Americans, *see Cohen's Handbook on Indian Law,* at 222–24, the White Earth Act statute of limitations meets this initial hurdle.

▇▇▇▇ Beyond this general point, the Court must consider whether the limitations period is nonetheless an invalid invasion of plaintiffs' due process rights. Stat-

utes of limitations affecting existing rights are constitutional if a "reasonable time is given for the commencement of the action before the bar takes effect." *Terry v. Anderson,* 95 U.S. (5 Otto) 628, 632–643, 24 L.Ed. 365 (1877); *see also Kalis v. Leahy,* 188 F.2d 633, 635 (D.C.Cir.), *cert. denied,* 341 U.S. 926, 71 S.Ct. 797, 95 L.Ed. 1357 (1951). The reasonableness of the time period is primarily a judgment for the legislature, "unless the time allowed is manifestly so insufficient that the statute becomes a denial of justice." *Wilson v. Iseminger,* 185 U.S. 55, 63, 22 S.Ct. 573, 575–76, 46 L.Ed. 804 (1902). As long as the statute is reasonable under all the circumstances—and, particularly, in light of the situation or emergency that impelled enactment of the law—the time bar comports with concepts of due process. *See, e.g., Texaco v. Short,* 454 U.S. 516, 528, 102 S.Ct. 781, 791–92, 70 L.Ed.2d 738 (1982); *Atchafalaya Land Co. v. F.B. Williams Cypress Co.,* 258 U.S. 190, 197, 42 S.Ct. 284, 286, 66 L.Ed. 559 (1922); *Wilson v. Iseminger,* 185 U.S. 55, 62–63, 22 S.Ct. 573, 575–76, 46 L.Ed. 804 (1902); *Saranac Land & Timber Co. v. Comptroller of New York,* 177 U.S. 318, 323–24, 20 S.Ct. 642, 644–45, 44 L.Ed. 786 (1900); *McGahey v. Virginia,* 135 U.S. 662, 706–07, 10 S.Ct. 972, 985–86, 34 L.Ed. 304 (1890).[5]

▇▇▇▇ Section 6(c) of the White Earth Act provides that plaintiffs must bring suit to recover title to allotments within 180 days of the statute's enactment or prior to certification by the Secretary that certain specified events have occurred, whichever is later. This is the limitations period challenged by plaintiffs. As mentioned above, the federal defendants have stated that certification will occur if, and as soon as,

---

5. The corollary of this general rule is that statutes of limitations that are unreasonably short and "designed to defeat the remedy" are unconstitutional. *See Edwards v. Kearzey,* 96 U.S. (6 Otto) 595, 603, 24 L.Ed. 793 (1878). Pointing to statements by the White Earth Act's sponsors that the Act was designed to prevent litigation, plaintiffs maintain that the statute was "designed to defeat" the possibility of litigation and therefore is unconstitutional. This argument misconstrues both legal principles and the purpose of the White Earth Act itself. The Act is not designed to strip White Earth Band mem-

bers of their claims to their land but to encourage out-of-court settlement of those claims according to the formula established by the Act. *See, e.g.,* White Earth Act § 2; S.Rep. 192, 99th Cong., 1st Sess. 12 (1985). The statute of limitations contained in the Act is not unconstitutional simply because it furthers this purpose. *Edwards v. Kearzey,* 96 U.S. (6 Otto) at 603. Rather, even if the purpose of the statute of limitations was as underhanded as plaintiffs paint it, the time period itself must be so unreasonably short that it effectively deprives plaintiffs of the right to bring suit. *Id.*

the Court denies plaintiffs' challenges to the Act—in other words, certification will occur nearly two years after President Reagan signed the Act.[6]

There is nothing presumptively unreasonable about this limitations period; courts have upheld statutes of limitations barring suit within similarly short periods of time. *See, e.g., DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (six months); *Canadian Northern Ry. Co. v. Eggen,* 252 U.S. 553, 40 S.Ct. 402, 64 L.Ed. 713 (1920); *Turner v. New York,* 168 U.S. 90, 18 S.Ct. 38, 42 L.Ed. 392 (1897) (six months); *Terry v. Anderson,* 95 U.S. (5 Otto) 628, 24 L.Ed. 365 (1877) (nine months, seventeen days); *Johnson v. Railway Express Agency, Inc.,* 489 F.2d 525 (6th Cir. 1973), *aff'd,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (one year). As long as the limitations period is reasonable under all the relevant circumstances, it passes the due process test.

The limitations period is unquestionably reasonable in light of the legislative goals underlying the White Earth Act. The Act was a response to *State v. Zay Zah,* 259 N.W.2d 580 (Minn.1977), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978), which invalidated tax forfeitures of White Earth Band land and thereby clouded title to hundreds of thousands of acres of Minnesota land. The White Earth Act attempts to quiet title to this vast area of Minnesota by encouraging either prompt suit by the heirs of the Indian allottees or acceptance of a monetary settlement for the heirs' land claims. *See* White Earth Act, §§ 2, 6(c), 8. Given the great social interest in quickly righting the wrongs done to the White Earth Band and in clearing title to so vast an area with equal speed, the limitations period appears reasonable.

This conclusion is buttressed by the venerable, and still valid, decision in *Turner v. New York,* 168 U.S. 90, 18 S.Ct. 38, 42 L.Ed. 392 (1897), *aff'd, Saranac Land & Timber Co.,* 177 U.S. 318, 20 S.Ct. 642, 44 L.Ed. 786 (1900). There, the Court upheld a six-month statute of limitation on actions to recover certain land sold for non-payment of taxes. Because the time bar merely demanded prompt action, and took away no rights, the Supreme Court held that the period was reasonable. 168 U.S. at 94, 18 S.Ct. at 40.

Plaintiffs argue, however, that such rules should not be applied to them because their personal circumstances transform an ordinarily reasonable time bar into an unreasonable one. They assert that the majority of the plaintiff class is poor, ill-educated, and ignorant of claims they relied on the government trustee to safeguard for them. However true these claims, they do not justify a finding that the limitations period violates plaintiffs' due process rights.

First, to the extent that plaintiffs are asking for special treatment simply because they are Indians, that special treatment may not be afforded them. Courts have routinely subjected Indians' claims to statutes of limitations. *See, e.g., United*

---

**6.** Plaintiffs argue that, for the purposes of the due process challenge, the Court must regard the 180-day period as the appropriate statute of limitations because the date of certification is both uncertain and exclusively within the control of the United States and Minnesota. *Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment,* at 19 n. 51. Although plaintiffs cite three cases as support for this proposition, none is on point. Rather, those cases involve either judicial discretion to toll statute of limitations on grounds of litigant's unfamiliarity with state procedure (*Roller v. Holly,* 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520 (1900)), the uncertainty that might follow retroactive application of a statute of limitations (*Lamb v. Powder River Livestock Co.,* 132 F. 434 (8th Cir.1904)), and interpretation of a statute of limitations with a clause designed to afford additional time in which to sue on accrued causes of action (*Fullerton v. Lamm,* 177 Or. 655, 163 P.2d 941 (1945)).

Whatever arguments plaintiffs may once have been able to advance against use of the date of certification as the statute's time bar, they can no longer claim that the 180-day period controls. Potential allottees have had the opportunity to sue for their allotments long after the 180-day period expired. It would fly in the face of common sense for the Court to ignore the fact that, at least for the past twenty-three months, the statute of limitations has not run and allottees could have—and can still—bring suit.

*States v. Mottaz,* 476 U.S. 834, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986); *Menominee Tribe v. United States,* 726 F.2d 718, 720 (Fed.Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984); *Hydaburg Cooperative Ass'n v. United States,* 667 F.2d 64, 229 Ct.Cl. 250 (1981), *cert. denied,* 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed.2d 166 (1982); *Andrade v. United States,* 485 F.2d 660, 664, 202 Ct.Cl. 988 (1973) (per curiam).

▇ Nor can plaintiffs argue that the limitations period is unreasonable because of the government's trust obligations, as statutes of limitations apply regardless of the existence of an Indian trust. *Menominee Tribe v. United States,* 726 F.2d at 721–22; *Andrade v. United States,* 485 F.2d 660, 661, 202 Ct.Cl. 988 (1973), *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed. 2d 57 (1974). Similarly, the fact that the allotments were held in trust neither makes plaintiffs' claims unknowable nor suggests that plaintiffs could not have sought advice during the past half-century about the nature of their claims.[7] Any dependence on the Bureau of Indian Affairs or reliance on the government's trust obligations may excuse plaintiffs from an accusation of *laches* but it does not necessarily exempt them from, or render unreasonable, a statute of limitations that imposes a time limit on their ability to bring suit. *See Hydaburg Cooperative Association v. United States,* 667 F.2d 64, 69–70 (1981), *cert. denied,* 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed.2d 166 (1982); *Capoeman v. United States,* 440 F.2d 1002, 194 Ct.Cl. 664 (1971) (en banc). As such, the Court cannot find that the existence of a trust relationship necessarily makes the White Earth Act's statute of limitations unreasonable. *See, e.g., Menominee Tribe v. United States,* 726 F.2d at 721–22; *Fort Mojave Tribe v. United States,* 546 F.2d 429, 210 Ct.Cl. 727, 728 (1976); *Capoeman v. United States,* 440 F.2d 1002, 194 Ct.Cl. 664 (1971).

▇ To the extent that plaintiffs argue that their unfortunate socioeconomic circumstances make it inherently unreasonable for them to bring suit within the Act's statute of limitations, that argument too cannot withstand scrutiny. Poverty and lack of education have never been deemed sufficient to render a statute of limitations unreasonable under the due process clause.[8] Moreover, in light of the fact that plaintiffs' families have had a claim to these allotments for generations, *Morrow v. United States,* 243 F. 854 (8th Cir.1917), the Court cannot find that plaintiffs' unfortunate circumstances sufficiently remove the new limitation on land claim suits from the realm of the reasonable. *See, e.g., Wilson v. Iseminger,* 185 U.S. 55, 62, 22 S.Ct. 573, 575, 46 L.Ed. 804 (1902) (courts not bound to remain open indefinitely to litigants who do not apply for redress).

Plaintiffs may be suggesting that their poverty and lack of education have combined with their reliance on the government's promise to perform its trust duties and have lulled them into relying on the government to protect their interests. Thus, plaintiffs may be suggesting that the Court should find that, while no one factor

---

**7.** Indeed, the record shows that certain members of the White Earth Band sought and obtained information about their land allotments. *Shulstad Affidavit, Cobe Affidavit.*

**8.** Statutes of limitations, for instance, apply to suits brought *in forma pauperis. See, e.g., Lyons v. Goodson,* 787 F.2d 411 (8th Cir.1986); *Coulibaly v. T.G.I. Friday's, Inc.,* 623 F.Supp. 860, 861 (S.D.Ind.1985); *Ortiz v. Hackett,* 581 F.Supp. 1258, 1260 (N.D.Ind.1984). Statutes of limitations are, however, tolled in cases of incompetency (*see, e.g.,* 55 C.J.S. *Limitations of Actions* § 243 (1948 and Supp.1987), where the plaintiff's claim was "unknown and inherently unknowable even in retrospect," *Urie v. Thompson,* 337 U.S. 163, 169, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949) (silicosis), or where defendants fraudulently concealed a claim that a plaintiff could not have discovered by the exercise of reasonable diligence, *e.g., Logan v. Zimmerman Brush,* 455 U.S. 422, 434–35 (1982); *Wood v. Carpenter,* 101 U.S. (11 Otto) 135 (1879); *Hohri v. United States,* 782 F.2d 227, 246 (D.C.Cir. 1986), *vacated on other grounds,* —— U.S. ——, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). While tolling principles are largely irrelevant to plaintiffs' claims, the last-mentioned doctrine suggests that mere ignorance of their claims does not excuse plaintiffs' failure to bring suit on the allotments issued to their forebears. Similarly it suggests that the newly imposed statute of limitations is not unconstitutional simply because plaintiffs were allegedly not well informed of the new rule.

renders the statute of limitations unreasonable, the *combination* of problems makes it unreasonable.

Although the Court recognizes that the plaintiffs' difficulties may combine synergistically and equal far more than the sum of their parts, this argument cannot stand. Plaintiffs have had more than fifty years in which to investigate and sue for their allotments. Regardless of their education, financial resources or the lack thereof, and their trust relationship with the government, plaintiffs are charged with knowledge of their affairs and their rights at law. *See, e.g., Menominee Tribe v. United States*, 726 F.2d 718 (Fed.Cir.), *cert. denied*, 459 U.S. 905, 105 S.Ct. 106, 83 L.Ed. 2d 50 (1984); *Hydaburg Cooperative Association v. United States*, 667 F.2d at 69–70; *Braude v. United States*, 585 F.2d 1049, 1054, 218 Ct.Cl. 270 (1978). Given this principle, the Court must find the statute of limitations a valid and reasonable exercise of congressional power that does not violate plaintiffs' due process rights.

**B. The election-of-remedies provisions do not unconstitutionally burden plaintiffs' access to courts.**

Plaintiffs also argue that the White Earth Act violates their constitutional right to access to courts by forcing them to forgo the statutorily set compensation mechanism if they elect to bring a land title suit. There is little merit to this argument.

■ Litigants have a due process right of access to courts *if* litigation offers the only effective means, if not the exclusive means, of resolving the dispute at hand. *United States v. Kras*, 409 U.S. 434, 445, 93 S.Ct. 631, 637–38, 34 L.Ed.2d 626 (1973); *Boddie v. Connecticut*, 401 U.S. 371, 374–78, 91 S.Ct. 780, 784–86, 28 L.Ed.2d 113 (1971). Once the state has made "access to the courts an entitlement or a necessity," it must afford that access "unless the balance of state and private interests favors the government scheme." *Logan v. Zimmerman Brush*, 455 U.S. 422, 430 n. 5, 102 S.Ct. 1148, 1154–55 n. 5, 71 L.Ed.2d 265 (1982).

■ The existence of the statute's compensation scheme itself belies any argument that plaintiffs' claims could be resolved only through litigation. The statute forces plaintiffs to choose between bringing suit for their land and seeking monetary compensation in exchange for extinguishing title or other rights to the land itself. This alternative clearly demonstrates that the courts are neither the exclusive nor the only effective means through which plaintiffs may seek redress. As such, the Court finds that the statute does not impermissibly interfere with any constitutionally protected right of access to courts.

**C. Plaintiffs received adequate notice of the White Earth Act.**

■ Plaintiffs assert that due process requires the federal government to provide them with "sufficient information to have a reasonable opportunity to sue on their land claims" before the White Earth Act statute of limitations runs. *Plaintiffs' Memorandum of Points and Authorities in Support of Summary Judgment*, at 25. As such, they argue, the notice provided by defendants was insufficiently detailed and therefore constitutionally inadequate.

Plaintiffs base this argument on a line of cases establishing requirements for notice when property or a property interest is about to be seized. *See id.* at 26 (*citing Mennonite Board of Missions v. Adams*, 462 U.S. 791, 91 S.Ct. 780, 28 L.Ed.2d 113 (1983) (notice before seizure of property for non-payment of taxes); *Memphis Gas, Light & Water Div. v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (notice prior to shut-off of utility services); *Covey v. Town of Somers*, 351 U.S. 141, 76 S.Ct. 724, 100 L.Ed. 1021 (1956) (notice to incompetent before property seizure); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (notice to trust beneficiaries). These cases, which pertain to notice in the context of adjudicatory hearings, are irrelevant to claims of improper notice of *a statute* and its effects. *See Texaco v. Short*, 454 U.S. 516, 535–36, 102 S.Ct. 781, 795–96, 70 L.Ed.

2d 738 (1982); *Brown v. McGarr,* 774 F.2d 777, 785 (7th Cir.1985).

Plaintiffs conflate two claims in their notice argument. First, they argue that they did not receive proper notice of the White Earth Act and its effects. But this claim rings hollow, as the ·White Earth Band actively fought the congressional proposals that became the White Earth Act. *See, e.g., White Earth Indian Land Claims Settlement: Hearings on S. 1396 before the Senate Select Committee on Indian Affairs,* 99th Cong., 1st Sess. 155–71, 187–201, 231–32 (1985). Plaintiffs cannot plead ignorance of facts with which they are well acquainted.

Even if plaintiffs had not participated, and lost, in the legislative debate, their claim of inadequate notice could not prevail. All persons, regardless of resources, are presumptively charged with knowledge of the law. *Atkins v. Parker,* 472 U.S. 115, 130, 105 S.Ct. 2520, 2530, 86 L.Ed.2d 81 (1985); *North Laramie Land Co. v. Hoffman,* 268 U.S. 276, 283, 45 S.Ct. 491, 494, 69 L.Ed. 953 (1925). As long as plaintiffs were afforded a reasonable opportunity to familiarize themselves and comply with the new law, publication of the statute amounted to the notice required by the due process clause. *Texaco v. Short,* 454 U.S. 516, 531–32, 102 S.Ct. 781, 793–94, 70 L.Ed. 2d 738 (1982). As the Seventh Circuit noted in *Brown v. McGarr,* 774 F.2d 777 (1985),

> [w]hen individual interests are adversely affected by a legislation action, publication of the statute puts all individuals on notice of a change in the law ...; individual notice is not required....

*Id.* at 785.

Moreover, all persons are charged with knowledge of events that receive widespread publicity. *See United Klans of America v. McGovern,* 621 F.2d 152, 154 (5th Cir.1980) (per curiam); *Smith v. Nixon,* 606 F.2d 1183, 1190 n. 42 (D.C.Cir. 1979), *cert. denied,* 453 U.S. 912, 101 S.Ct.

3147, 69 L.Ed.2d 997 (1981) (*quoting Lee v. Kelley,* No. 76–1185, slip op. at 3 (D.D.C. Jan. 31, 1977). As the facts demonstrate that the White Earth Act was the subject of numerous news reports and great public debate in Minnesota, *see* Cobe Affidavit, Exhibit 19, plaintiffs must be deemed to have been on sufficient notice of the change in the law.[9]

■ No court has ever found that property owners have a due process right to notice of precisely how their property right would be affected by a statute. "It has never been suggested that each owner must in some way be given specific notice of the impact of a new statute on his property before that law may affect his property rights." *Texaco v. Short,* 454 U.S. at 536, 102 S.Ct. at 795–96. Nor has it been suggested that a property owner must be given full information about his or her property rights before those rights may be affected by a new law. While plaintiffs are unlike other property owners to the extent that they are not responsible for the day-to-day management of properties held in trust for them, *see United States v. Mitchell,* 463 U.S. 206, 227, 103 S.Ct. 2961, 2973, 77 L.Ed.2d 580 (1983), they cannot be deemed ignorant of the fact that they have some rights as heirs to a land allotment. *See Blanton v. Anzalone,* 760 F.2d 989, 992 (9th Cir.1982); *Braude v. United States,* 585 F.2d 1049, 1054, 218 Ct.Cl. 270 (1978).

Plaintiffs also appear to argue that, in view of their lack of resources and little information about their land claims, due process requires defendants to provide plaintiffs with enough information to sue on their land claims before the statute of limitations is permitted to run. Undergirding this argument are separate lines of reasoning, neither of which is supported by the law.

As an initial matter, this notice argument rests in part on the alleged unconstitution-

---

9. Plaintiffs' claims of inadequate notice are particularly inappropriate for another reason. Defendants did not simply rely on publication and publicity but actually attempted to communicate news of and information about the White

Earth Act to all affected parties. *See* Cobe Affidavit, Exhibits 5, 7, 9, 10, 15–17. As such, at least some members of the plaintiff class received more than the minimally required notice of the new law.

ality of the statute of limitations. Plaintiffs argue that they are entitled to all the information gathered by the government as part of its trust duties to plaintiffs before the statute of limitations runs. But, as the statute of limitations may run despite plaintiffs' alleged reliance on the Bureau of Indian Affairs and despite any trust obligations of the federal government, *see, e.g., Hydaburg Cooperative Association v. United States,* 667 F.2d 64, 69–70, 229 Ct.Cl. 250 (1981), *cert. denied,* 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed.2d 166 (1982), plaintiffs' argument is unsupported by law.

The other flaw in plaintiffs' notice argument is the unstated assumption that plaintiffs must have full information about their claims before they can bring suit. Nothing prevents a plaintiff from bringing suit with far less than full information about his or her claim. *See Braude v. United States,* 585 F.2d 1049, 1054, 218 Ct.Cl. 270 (1978). As such, plaintiffs have no legitimate due process challenge to allowing the statute of limitations to run before they receive full information about their individual allotments and claims.

In sum, the Court finds that the White Earth Act statute of limitations does not violate plaintiffs' rights under the due process clause. Nor are plaintiffs' due process rights violated by the election-of-remedies provisions or the notice provided to plaintiffs. The Court must now consider plaintiffs' other set of constitutional challenges to the White Earth Act.

### THE WHITE EARTH ACT DOES NOT TAKE PLAINTIFFS' PROPERTY WITHOUT JUST COMPENSATION.

Plaintiffs argue that the White Earth Act takes their property and fails to provide them with just compensation, in violation of the Fifth Amendment. Plaintiffs do not, however, clearly state *what* property was taken and when the taking occurred.

Plaintiffs appear to claim that the White Earth Act takes their interest in allotments on the White Earth Reservation without just compensation. *But see Plaintiffs' Memorandum in Support of Summary Judgment,* at 35 n. 72. But, as plaintiffs

would be the first to admit, few of plaintiffs' land claims have been tested in court. Thus, if the Act effects a taking of plaintiffs' property, the property taken is either plaintiffs' cause of action to perfect their land claims, plaintiffs' interest in allotments as determined by the Secretary of the Interior pursuant to § 7 of the Act, or plaintiffs' property right to a known allotment or fractional interest in a known allotment. However the taking is defined, plaintiffs' rights have been safeguarded.

**A. The White Earth Act does not take plaintiffs' right to sue for determination of their land claims without just compensation.**

Plaintiffs have neither an arguable claim that their right to bring a land claims suit was "taken" by the statute nor an arguable right to compensation for the "loss" of that right. As detailed above, the White Earth Act merely creates a reasonable, if short, statute of limitations for bringing suit to recover properties covered by the Act. There is no taking, and no constitutional right to compensation, when a new statute of limitations is imposed as long as those affected are afforded a reasonable opportunity to bring suit. *See Texaco v. Short,* 454 U.S. 516, 531–32, 102 S.Ct. 781, 793–94, 70 L.Ed.2d 738 (1982); *Block v. North Dakota,* 461 U.S. 273, 286 n. 23, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983); *Keller v. Dravo Corp.,* 441 F.2d 1239, 1242 (5th Cir.1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972).

**B. The White Earth Act does not take plaintiffs' interests in land without just compensation.**

Nor can plaintiffs successfully claim that the White Earth Act fails to provide just compensation for the taking of plaintiffs' interests in land. The Act extinguishes plaintiffs' claims to land on the White Earth Reservation in exchange for compensation at

the fair market value of the land interest ... as of the date of tax forfeiture, sale, allotment, mortgage, or other transfer

... less any compensation actually received, plus interest compounded annually at 5 per centum from the date of said loss of an allotment or interest until the date of enactment of this Act, and at the general rate of interest earned by United States Department of the Interior funds thereafter.

Pub.L. 99–264, § 8(a).[10]

It is not clear whether plaintiffs claim that their property was taken when the individual allotments were improperly alienated or by the White Earth Act itself. There is some authority for the proposition that the taking occurred when the allotments were alienated and the government, as trustee for the allottees, permitted the disposals to stand. *See United States v. Creek Nation,* 295 U.S. 103, 110–111, 55 S.Ct. 681, 684–85, 79 L.Ed. 1331 (1935). Moreover, this is the most sensible interpretation in light of the language of the statute itself. Accordingly, the Court will assume that plaintiffs seek compensation for a taking that occurred whenever the allotments in which plaintiffs have an interest were sold, mortgaged, forfeited for taxes, or otherwise improperly alienated from plaintiffs or their ancestors.

The plaintiffs, as owners of at least fractional interests in these allotments,[11] are entitled to compensation at the fair market value of the land at the time of the taking, plus an amount sufficient "to produce the present full equivalent" of that value. *Id.* at 111, 55 S.Ct. at 684–85; *Antoine v. United States,* 710 F.2d 477, 479–80 (8th Cir.1983). Interest at a "reasonable rate"

is an appropriate measure for determination of the amount to be added. *Id.* at 480.

Although the White Earth Act obviously attempts to compensate allottees with the present-day equivalent of their lost allotments, plaintiffs maintain that the amount of compensation provided is not the constitutionally required "just compensation." They further maintain that Congress intended the compensation to fall short of the constitutional mandate. Whether plaintiffs are correct or not, this allegedly intentional inadequacy does not offend the Constitution.

A party may, pursuant to the Tucker Act, 28 U.S.C. § 1491, usually bring suit in the United States Claims Court to challenge the constitutional adequacy of compensation paid when the federal government takes his or her property.[12] *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016–17, 104 S.Ct. 2862, 2879–80, 81 L.Ed.2d 815 (1984); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 126–27, 95 S.Ct. 335, 349–50, 42 L.Ed.2d 320 (1974). Only if Congress expressly withdraws Tucker Act jurisdiction over that category of takings is redress in the Claims Court unavailable. *Regional Rail Reorganization Cases,* 419 U.S. at 126–27, 95 S.Ct. at 349–50. As the White Earth Act explicitly permits compensation recipients to challenge the amount of compensation in a Tucker Act suit, Pub.L. 99–264, § 6(d), any White Earth Act claimant may challenge the statutory level of compensation in a suit in the Claims Court.

---

**10.** The Act also provides that the fair market value of allotments sold or mortgaged by minors or in a fraudulent transaction shall not be reduced by compensation actually received when the land was alienated from the allottee or heir. Pub.L. 99–264, § 7(a). The Act goes on to prohibit compensation for loss of an allotment or interest later determined by the Secretary of the Interior to have been improperly received in a State probate court proceeding. *Id.*

**11.** Defendants argue that plaintiffs' ownership rights are speculative, as no court has determined actual ownership of each allotment and plaintiffs' only "right" is the right to bring suit to determine their ownership claims. While this may reflect plaintiffs' current status, it may

be that individuals eligible for compensation under the Act will have had their property rights determined by the Secretary of the Interior. *See* Pub.L. 99–264, § 7.

**12.** The Tucker Act, codified at 28 U.S.C. § 1491, provides in pertinent part:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort
...

Thus, plaintiffs' ability to obtain just compensation does not "depend solely on the validity of the statutory compensation scheme," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984), but also on the availability of the Tucker Act remedy. Nonetheless, and regardless of the lack of ripeness of any individual claim of unjust compensation, plaintiffs maintain that the Tucker Act remedy is constitutionally inadequate as it applies to all who seek compensation under the White Earth Act.

■ First, plaintiffs attack the validity of the Tucker Act remedy itself. They argue that the Claims Court lacks jurisdiction to determine any claims of unjust compensation and therefore the Tucker Act remedy cannot constitutionally remedy their takings claims. Plaintiffs base their argument on *Northern Pipeline Co. v. Marathon Oil*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and its progeny, which mandate that only courts established pursuant to Article III determine constitutional questions.

This line of reasoning misconstrues the nature of a Tucker Act suit. Such a suit does not challenge the constitutionality of an uncompensated taking but seeks an adjustment in the remedy for the taking of property. As a party may appeal from the Claims Court to an Article III Court, there is no possible constitutional violation. *See, e.g., Ingalls Shipbuilding v. United States*, 13 Cl.Ct. 757, 762 (1987). Most likely for that very reason, the Supreme Court has sanctioned resort to the Claims Court for compensation claims even after *Marathon Oil. See, e.g., Thomas v. Union Carbide Agricultural Products*, 473 U.S. 568, 593 n. 4, 105 S.Ct. 3325, 3339 n. 4, 87 L.Ed.2d 409 (1985); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017–19, 104 S.Ct. 2862, 2880–81, 81 L.Ed.2d 815 (1984).[13]

■ Plaintiffs also assert that the Tucker Act remedy, even if constitutionally adequate in some cases, cannot constitutionally remedy the inadequate compensation available under the White Earth Act. They maintain that Congress deliberately provided inadequate compensation for the takings under the White Earth Act and that the possibility of a remedy under the Tucker Act cannot shield this intentionally unconstitutional compensation scheme.

In the *Regional Rail Reorganization Act Cases*, the Supreme Court noted that the Tucker Act remedy is sufficient at least when a statute's "basic compensation scheme … is valid but could result in payment of less than the constitutional minimum." 419 U.S. at 150, 95 S.Ct. at 362. This is precisely the situation plaintiffs face under the White Earth Act.

Plaintiffs who have legitimate land claims are entitled to the value of their property at the time of the taking plus a "reasonable rate" of interest sufficient to compensate for the delay in payment by producing "the present full equivalent of that value [which should have been] paid contemporaneously with the taking." *United States v. Creek Nation*, 295 U.S. 103, 111, 55 S.Ct. 681, 684–85, 79 L.Ed. 1331 (1935); *Antoine v. United States*, 710 F.2d 477, 479–80 (8th Cir.1983). The White Earth Act would provide these plaintiffs with the fair market value of the land at the time of the taking, plus 5 percent compounded interest from that date through the date on which the statute was enacted, plus the rate of interest paid on Department of Interior funds from the enactment date through the date on which the award was paid. The Court must conclude that this scheme is a good faith effort to compensate plaintiffs fairly, which, in light of the availability of a Tucker Act suit, is all that the law requires. *See, e.g., United States v. Sioux Nation of Indians*, 448

---

13. As plaintiffs suing under the Tucker Act for a remedy in an Article I court with a right of appeal to an Article III court, their position is analogous to litigants who proceed before administrative tribunals or United States Magistrates with a right of appeal to an Article III judge. As the Supreme Court has noted, "many matters that involve the application of legal standards to facts and affect private interests are routinely decided by agency action with limited or no review by Article III courts." *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 593, 105 S.Ct. 3325, 3339–40, 87 L.Ed.2d 409 (1985).

U.S. 371, 389, 408–09, 100 S.Ct. 2716, 2727–28, 2737–38, 65 L.Ed.2d 844 (1980).

The 5 per cent compounded rate of interest may not precisely reflect the average prevailing rates of interest throughout the period in which plaintiffs were deprived of their land.[14] This does not render the compensation scheme invalid. Because statutorily set rates of "interest with respect to a deficiency"—the rates at issue here—are a floor on compensation that the Claims Court can, if necessary, exceed, this proximity meets the requirements of the Constitution. *See, e.g., Miller v. United States,* 620 F.2d 812, 837–40, 223 Ct.Cl. 352 (1980); *United States v. Blankinship,* 543 F.2d 1272, 1275–76 (9th Cir.1976); *see also, e.g., Schor v. Commodities Futures Trading Commission,* 740 F.2d 1262, 1287 (D.C.Cir. 1984), *rev'd on other grounds,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (court must interpret legislation as if constitutional).

■ Finally, plaintiffs argue that the White Earth Act so limits their ability to bring a Tucker Act suit that it transforms the Tucker Act from a "safety net" to a "delusive remedy." In particular, plaintiffs take issue with the White Earth Act's mandate that Tucker Act suits must be brought within six months after administrative determinations of compensation due to the allottee. The Court is not convinced that this statute of limitations disadvantages plaintiffs at all.

Ordinarily, any claim under the Tucker Act must be brought "within six years after such claim first accrues." 28 U.S.C. § 2501. This statute, like its predecessor (which was identical in all pertinent respects), has been interpreted to mean that a Tucker Act suit will be barred unless brought within six years *of the date on which the property at issue was taken or the date on which the owner had con-*structive notice of the taking. *See, e.g., Mitchell v. United States,* 10 Cl.Ct. 63, *modified in part on other grounds,* 10 Cl.Ct. 787 (1986) (date of constructive notice); *Bellamy v. United States,* 7 Cl.Ct. 720 (1985); *Pete v. United States,* 531 F.2d 1018, 209 Ct.Cl. 270 (1976) (per curiam); *Steel Import & Forge Co. v. United States,* 355 F.2d 627, 174 Ct.Cl. 24 (1966). As the White Earth Act's six-month statute of limitations on Tucker Act suits runs from the date on which the allottee is notified of an administrative determination of the amount of compensation to which he or she is entitled—a date almost certainly more than six years after the taking or constructive notice of the taking—the Act, if anything, extends the time available for Tucker Act suits.

The Court recognizes the possibility, however unlikely, that some plaintiffs may be able to show that they never had constructive notice of the taking of land until they were notified that they were allottees affected by the Act. These plaintiffs might well be afforded less time in which to sue than other Tucker Act litigants. This does not render the six-month statute of limitations invalid.

As discussed in detail above, a statute of limitations is valid as long as it offers a litigant with an existing cause of action a reasonable period in which to sue. *See, e.g., Texaco v. Short,* 454 U.S. 516, 527 n. 21, 102 S.Ct. 781, 791 n. 21, 70 L.Ed.2d 738 (1982) (*quoting Wilson v. Iseminger,* 185 U.S. 55, 62–63, 22 S.Ct. 573, 575–76, 46 L.Ed. 804 (1902)). Unless the time granted is so short that it would result in a miscarriage of justice, a Court cannot second-guess Congress's determination of the reasonableness of a time bar. *Wilson v. Iseminger,* 185 U.S. at 62–63, 22 S.Ct. at 575–76. The Court cannot fault Congress's judgment that White Earth claimants could reasonably bring suit for just compensation

---

14. In *Pitcairn v. United States,* 547 F.2d 1106, 212 Ct.Cl. 168 (1976) (en banc) (per curiam), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), the Court of Claims documented the rates of interest prevailing during much of the past half-century. According to *Pitcairn,* a "reasonable rate" of interest to compensate takings of property would have been 6 percent for the period 1927–37, 5 percent for 1937–44, 4 percent for 1944–55, 4½ percent for 1956–60, 4¾ percent for 1961–65, 6½ percent for 1966–70; and 7½ percent for 1971–75. *Id.* at 1120–21. The prime rate, however, was lower than these rates for much of this period. *Id.* at 1124.

within six months after receiving an administrative determination of the amount of compensation to which they are entitled.

These six months follow a long period of time in which allottees could have discovered information about their land claims. Moreover, the six-month period will begin to run only after the Secretary of the Interior undertakes the substantial administrative proceedings demanded by the White Earth Act and develops a factual record about each allotment that will enable an allottee to bring suit far more speedily than the ordinary Tucker Act litigant. *See* White Earth Act, § 7. As such, the Court cannot find that the six-month time bar is designed to defeat the Tucker Act remedy or would otherwise result in injustice to White Earth Act claimants. *See, e.g., Edwards v. Kearzey*, 96 U.S. (6 Otto) 595, 603, 24 L.Ed. 793 (1878); *Terry v. Anderson*, 95 U.S. (5 Otto) 628, 24 L.Ed. 365 (1877).

■ Finally, plaintiffs assert that, as other Tucker Act litigants have six years in which to sue, the White Earth Act's six-month statute of limitations deprives plaintiffs of equal protection of the laws. Plaintiffs are not correct.

First, as it is far from clear that plaintiffs are harmed by the six-month limitations period, whether plaintiffs have any claim under the equal protection clause is uncertain. *See generally* L. Tribe *American Constitutional Law* 1436–39 (1982). Assuming *arguendo* that the six-month time bar would force at least one member of the plaintiff class to bring a Tucker Act suit less than six years after actual or constructive notice of the taking of his or her property, that alone does not compel a finding of denial of equal protection.

■ The statute of limitations must be sustained against an equal protection challenge "if the classifications it employs 'rationally further the purpose identified' by the federal government." *Washington v. Confederated Bands & Tribes*, 439 U.S. 463, 500, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979) (*quoting Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976)).[15] There can be little doubt that the White Earth Act's statute of limitations furthers the statute's stated goals of ending the uncertainties surrounding the White Earth claims expeditiously and allowing claimants a reasonable period of time in which to challenge the compensation determination. *See* Pub.L. 99–264, § 2. As such, the Court cannot find that the Tucker Act statute of limitations violates the equal protection clause.

## THE COURT CANNOT GRANT THE ALTERNATIVE RELIEF REQUESTED BY PLAINTIFFS.

Plaintiffs do not simply ask for a finding that the White Earth Act is unconstitutional. In the alternative, they ask the Court, if it upholds the Act, to find that defendants violated their trust duties by failing to make heirship determinations and to provide legal assistance sufficient to allow the heirs to bring suit to recover their land. They also ask the Court to order defendants to perform those duties and to enjoin the Secretary from publishing certification that the enumerated conditions have been met (thus tolling the statute of limitations) before those trust duties are carried out.

■ Even assuming *arguendo* that defendants have failed to perform "trust duties,"[16] the Court cannot grant the requested relief. Because plaintiffs seek to compel the Secretary of Interior to perform a duty owed them, the Court must treat

15. Plaintiffs did not address what level of scrutiny the Court should apply to their equal protection claim. While it is possible that "strict scrutiny" may be the appropriate analytical tool for cases that make explicit, race-based distinctions "directed at the persons of American Indians," L. Tribe, *American Constitutional Law* 1472 (1982), it is not appropriate for cases involving distinctions arising out of the law's view of American Indians as a distinct *political* group. *See, e.g., Washington v. Confederated Bands &*

*Tribes*, 439 U.S. 463, 500–01, 99 S.Ct. 740, 761–62, 58 L.Ed.2d 740; *Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483–84, 41 L.Ed. 290 (1974). As land claims cases fall within that category, and as the White Earth Act is facially neutral, the Court will not employ the strict scrutiny test in this case.

16. The Court is not convinced by defendants' arguments against the idea that the "obligations" outlined by plaintiffs constitute "trust duties." The General Allotment Act, and subse-

their request as a petition for a writ of mandamus. 28 U.S.C. § 1361; *see also 13th Regional Corp. v. United States Department of Interior,* 654 F.2d 758, 760 (D.C.Cir.1980).

Mandamus will issue " 'only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable.' " *Id.* (*quoting United States ex rel. McLennan v. Wilbur,* 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931)). The question is largely one of congressional intent: "If Congress had an intent with respect to the question at issue and if that intent was to create a mandatory, nondiscretionary duty on the part of the official(s) charged with administering the [duty], then mandamus is appropriate (if no other remedy is adequate)." *American Cetacean Society v. Baldrige,* 768 F.2d 426, 434 (D.C.Cir. 1985), *rev'd on other grounds sub nom. Japan Whaling Association v. Baldrige,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).

Neither a specific ministerial duty nor a congressional intent to create such a duty marks this case. Rather, plaintiffs seek to compel defendants to exercise their discretion with respect to their trust duties *in a particular manner.* Mandamus cannot compel this. *See, e.g., Panama Canal Co. v. Grace Line,* 356 U.S. 309, 317–18, 78 S.Ct. 752, 757–58, 2 L.Ed.2d 788 (1958). Moreover, Congress has, if anything, rejected plaintiffs' position by tabling an amendment that would have obligated the government to provide certain plaintiffs with full information about their land claims. 131 Cong.Rec. S17586 (daily ed. Dec. 13, 1985). In light of these facts, the Court would gravely abuse its discretion if it ordered the alternative relief sought by plaintiffs.

## CONCLUSION

The history of our treatment of Native Americans is made no less tragic by the passage of time. The ancestors of the plaintiffs in this case ceded their vast territory in exchange for a promise that some of that land would one day be theirs; what plaintiffs want, at base, is to have that promise made real.

That plaintiffs have the Court's full sympathy should be clear. But they have come to a court, not a legislature, and the Court's sympathies cannot be placed above the law's command. Accordingly, the Court must find the White Earth Act constitutional and must deny plaintiffs the alternative relief they seek. As such, plaintiffs are entitled neither to a preliminary injunction nor to summary judgment. Plaintiffs have, however, also moved for class certification, and the Court must grant that motion, as plaintiffs are entitled to be certified as a class.

The Court will enter summary judgment in favor of defendants and defendant-intervenors and will deny plaintiffs' motions for preliminary injunctive relief and summary judgment. The Court will issue an Order, of even date herewith, memorializing these decisions.

---

quent acts authorizing particular allotments, imposed on the federal government a trust duty to prevent the improvident alienation of allotted land. *United States v. Mitchell,* 445 U.S. 535, 544 & n. 5, 100 S.Ct. 1349, 1354–55 n. 5, 63 L.Ed.2d 607 (1980). Consequently, plaintiffs arguments have more force than may at first appear. Nonetheless, whether these obligations are properly termed "trust duties" is ultimately irrelevant to a decision in this case.