**NATIVE AMERICAN MOHEGANS, et al.**

v.

**UNITED STATES, et al.**

No. 3:00CV2015(JBA).

United States District Court, D. Connecticut.

Feb. 12, 2002.

---

200

Martin Chorches, Anthony Steven Novak, Chorches & Novak, P.C., Wethersfield, CT, Juliet D. Hiznay, Lawrence G. McBride, Freedman, Levy, Kroll & Simonds, Patrick J. Kearney, Foley & Lardner, Emil Hirsch, O'Connor & Hannan, Washington, DC, for Plaintiffs.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, Joseph Bree Burns,

Rome McGuigan Sabanosh, Mark F. Kohler, Attorney General's Office, Hartford, CT, for Defendants.

## MEMORANDUM OF DECISION

[Doc. ##25, 28, 30]

ARTERTON, District Judge.

### TABLE OF CONTENTS

I. Introduction .................................................... 201

II. Factual Background ............................................. 202

III. Discussion ..................................................... 207
 A. State's Motion to Dismiss ................................. 207
 1. Sovereign immunity .................................. 207
 2. Necessary and indispensable parties ................. 210
 i. Necessary party ................................. 211
 ii. Indispensable party ............................ 211
 B. Tribal Defendants' Motion to Dismiss ..................... 213
 1. Tribal sovereign immunity ........................... 214
 2. Necessary and indispensable parties ................. 217
 C. Federal Defendants' Motion to Dismiss .................... 217
 1. Statute of limitations .............................. 217
 i. The purpose of § 1775h .......................... 218
 ii. § 1775h comports with due process ............. 220
 2. Tribal recognition .................................. 222

IV. Conclusion ..................................................... 223

## I. Introduction

The origins of the present dispute arose with the split of the historic Mohegan Indian Tribe into two factions in the 1970s, following disagreement within the Mohegan Tribal Council as to whether to pursue a land claim suit against the State of Connecticut and/or a petition for federal recognition. One faction, the Mohegan Tribe of Indians of Connecticut ("MTIC"), has since reaped the benefits of federal acknowledgment and the settlement of the land claims suit against the State of Connecticut, and now operates Mohegan Sun, a successful casino operation in Montville, Connecticut. Plaintiff Native American Mohegans ("NAM"), the other faction, together with several members of Native American Mohegans, filed this lawsuit against MTIC, the State of Connecticut, the United States and various federal officials and agencies, alleging that the Mohegan Nation of Connecticut Land Claims Settlement Act of 1994[1] (the "Settlement Act"), which describes MTIC as "the successor in interest to the aboriginal entity known as the Mohegan Indian Tribe" and purports to extinguish the land claims of the Mohegan Tribe, is unconstitutional, or alternatively, seeking declaratory relief that NAM's land claims were not extinguished by the Settlement Act. Plaintiff

---

1. 25 U.S.C. § 1775.

NAM also seeks judicial recognition as a federally-recognized tribe.

For the reasons set forth more fully below, this case is dismissed in its entirety. More specifically, the Court finds that both the State of Connecticut and MTIC are entitled to sovereign immunity from suit. The Court also concludes that the State is a necessary and indispensable party, without which the case cannot go forward on plaintiffs' claims seeking declaratory relief as to whether the Settlement Act extinguished land claims to which NAM might be entitled. Accordingly, those claims are dismissed. Similarly, MTIC is a necessary and indispensable party to plaintiffs' claim seeking imposition of a constructive trust on the proceeds of the Mohegan Sun casino, and that claim must be dismissed. In contrast, the Court finds that the State is not indispensable to plaintiffs' constitutional challenges to the Settlement Act's 180 day statute of limitations, and as MTIC waived its immunity from suit as to that claim, the Court has jurisdiction to address it.

On the merits of plaintiffs' constitutional challenge to the statute of limitations, the Court concludes that the 180 day statute of limitations is reasonably related to the interest in ensuring a short time period in which the Settlement Act's legality could be determined to protect the reliance interest of the State, MTIC and the Town of Montville. In addition, the statute of limitations does not violate due process because plaintiffs' constitutional challenges could have been brought within 180 days of October 19, 1994, as provided in the Settlement Act. As the statute of limitations is not unconstitutional, plaintiffs' substantive constitutional challenges to the Act itself are time-barred.

Finally, the Court concludes that NAM's failure to exhaust its administrative remedies through the Bureau of Indian Affairs compels dismissal of its claim for a judicial declaration that it is a federally-recognized tribe.

## II. Factual background

The following factual summary is taken from plaintiffs' amended complaint and is assumed to be true for purposes of this motion to dismiss.[2]

John Hamilton was appointed Grand Sachem of the Mohegans by his mother, the Queen of the Mohegans, in 1933. This title was affirmed as "Sachem for Life" by the Mohegan Tribal Council in 1936. Hamilton's leadership was recognized and supported by the Mohegans, including Courtland Fowler, from 1933 through the 1960s. In the late 1960s, Hamilton was authorized by the Council of Descendants of Mohegan Indians to act on its behalf in matters pertaining to the relations between the Mohegan Indian Tribe and the State of Connecticut. At that time, Fowler served on the Council under Hamilton.

In 1970, a faction of Mohegans became dissatisfied with the prospects of the Mohegan Indian Tribe filing a land claim suit, and at an unofficial Council meeting in May 1970, sought to elect a new leader of the Mohegan Tribe. Hamilton rejected the asserted authority of the Council to replace him, and he and his followers left the meeting. The remaining Mohegan Indians at the meeting elected Courtland Fowler as their leader. Despite this schism, however, from the 1970s until 1994, no Mohegan Indian was excluded from participation in traditional practices, events or ceremonies by virtue of associa-

---

**2.** *Nettis v. Levitt*, 241 F.3d 186, 191 (2d Cir. 2001); *Johnson v. Newburgh Enlarged Sch.* *Dist.*, 239 F.3d 246, 250 (2d Cir.2001).

tion with either the Hamilton or Fowler faction of Mohegan Indians.

Hamilton continued to pursue a land claim suit on behalf of the Mohegan Tribe, and retained counsel for the purpose of prosecuting the land claim suit. In 1977, "The Mohegan Tribe," acting through Hamilton, filed a land claim suit in federal district court in Connecticut against the State of Connecticut, asserting that aboriginal and historic claims and titles to over 2,000 acres in Montville, Connecticut had been extinguished in violation of the Non–Intercourse Act.[3] Hamilton further filed a notice with the Bureau of Indian Affairs ("BIA") seeking federal acknowledgment of "The Mohegan Tribe" in 1978. Both the land claim suit and the acknowledgment petition were filed on behalf of the Mohegan Tribe by attorney Jerome Griner, who had been retained by Hamilton under his authority as Grand Sachem.

From May 1970 through 1979, the Fowler faction continued to actively and publically oppose both the land claim suit and the federal acknowledgment petition. From 1979 to 1981, the Fowler faction organized an entity called the "Mohegan Tribal Council" and adopted a constitution for its governance in 1980.[4] At around this time, Griner, counsel of record for the Mohegan Tribe in the land claim suit and the federal acknowledgment petition, ceased accepting direction from Hamilton and instead began to take direction from the Fowler faction, without notifying either the federal court or the BIA of his change in clients. Upon discovering that Griner had begun to serve the interests of the Fowler faction in 1981, Hamilton discharged Griner and retained separate counsel, Robert Cohen. Although the State raised the issue of the propriety of filings by two attorneys on behalf of "The

Mohegan Tribe" in the land claim suit when Cohen filed his appearance in 1981 and then later in 1989, the issue of authorization for the filings of Griner and Cohen was never resolved by the district court.

In 1985, Griner filed detailed documentation before the BIA in support of the 1978 acknowledgment petition on behalf of "The Mohegan Tribe, petitioner." Griner submitted an MTIC membership roll of 1,017 members, claiming that this roll relied on lists of Mohegan Indians prepared by the State of Connecticut. The BIA then placed the petition under "active consideration."

Also in 1985, the State of Connecticut filed a formal opposition to federal acknowledgment with the BIA, characterizing Hamilton and his followers and the Fowler group as two factions of a single, unitary Mohegan Tribe. In support of this position, the State relied on a 1979 letter from a member of the Fowler faction stating that " 'they do not have a tribal organization because they are going to organize to form a tribal group for the sole purpose of combating John Hamilton.' "

In November 1989, the BIA announced its proposed decision that the United States would not acknowledge the Mohegan Tribe, based on its finding that from 1941 to the date of the rejection, the Mohegan Tribe did not demonstrate sufficient social community or sufficient political authority and influence, as required under 25 CFR 83.7(b) and (c). The BIA did not examine the files and records of Hamilton or the Council prior to issuing the proposed rejection. In 1990, Cohen submitted a response to the BIA pointing out that the BIA had never examined these files, and in which he narrated the internal leadership and external political and land claim

---

**3.** 25 U.S.C. § 177.

**4.** The Fowler faction amended its constitution in 1984 and renamed itself the Mohegan Tribe of Indians of Connecticut ("MTIC").

efforts of Hamilton from 1941 until his death in 1988.

MTIC issued new membership restrictions in 1990, which limited membership in the Mohegan Tribe of Indians of Connecticut to lineal descendants of Francis Fielding and his wife Rachel Hoscott Fielding (1802 to 1860), or of Amy Cooper, who was adopted by William Fielding, a child of Rachel Hoscott Fielding and Francis Fielding. Plaintiffs claim that "MTIC maintains that there were no other Mohegan Indians alive in the first half of the nineteenth century with living descendants [and] ... that the families of any and all Mohegan Indians alive during 1802–1860 (other than the family of Rachel Fielding) are 'extinct.'" [5] After adopting this restriction, MTIC removed approximately 118 people from its membership roll whom it had previously determined to be Mohegan, and whom plaintiffs claim were on the membership roll originally submitted to the BIA in 1985. NAM claims that these 118 excluded people are Mohegan by standards known and employed in Mohegan tradition prior to 1990. After the federal acknowledgment petition was rejected by the BIA in 1990, MTIC wrote to certain followers of Hamilton who were also lineal descendants of Rachel Fielding or Amy Cooper and invited them to join MTIC.

Plaintiff NAM is an unincorporated tribal organization representing the interests of its membership, Native Americans of Mohegan ancestry, community and traditions. NAM's membership allegedly consists of the living descendants of the aboriginal Mohegan Indian Tribe who are followers of the Mohegan leadership of John Hamilton during his lifetime, and of his successor Eleanor Fortin, who was appointed by Hamilton in his will following his death in 1988. NAM has approximately 640 members. Plaintiffs Edward D. Daigle, Ruth Sweet and Frank E. Cook are individuals of Mohegan ancestry and members of NAM. Many of the members of NAM, including plaintiffs Daigle, Sweet and Cook, cannot qualify for membership in MTIC because they are not lineal descendants of Rachel Fielding or Amy Cooper.

In 1993, Fortin filed a notice of intent to petition for federal acknowledgment and recognition with the BIA on behalf of the Mohegan Tribe and Nation, Inc. This petition has since been claimed by NAM and is currently pending before the BIA.

In 1994, the BIA reversed its position as to the pending petition of "the Mohegan Tribe," and published notice of intent to grant federal recognition to "The Mohegan Tribe of Indians of the State of Connecticut." This was the final action on the original acknowledgment petition filed by Griner in 1978 on behalf of " 'The Mohegan Indians, of which I, John E. Hamilton, am Grand Sachem.'" The BIA recognition decision expressly relied on Cohen's 1990 submission detailing Hamilton's leadership and political activity, as well as the activity of other members of NAM that had been opposed by the Fowler faction, and plaintiffs allege that absent the leadership and activities of Hamilton and the Council, the BIA would have had no basis for reversing its 1989 proposed rejection.

Upon receipt of federal recognition in 1994, MTIC negotiated and executed agreements with the State of Connecticut and the Town of Montville, in which the parties agreed to seek federal legislation ratifying those agreements. In the State Agreement, the parties agreed to seek enactment of federal legislation extinguishing all aboriginal land claims in the State of Connecticut, and to ratify all conveyances of aboriginal or historic Mohegan title to the State which might have violated the

5. Amended Compl. [# 23] at ¶ 32.

Non–Intercourse Act. The parties also agreed that the State would transfer certain land to the United States and that MTIC would acquire and transfer additional land to the United States, which would be held in trust for MTIC as the reservation of the Mohegan Tribe.

During hearings on the proposed federal legislation, the BIA advised Congress that this proposed legislation would extinguish all Mohegan land claims in the State of Connecticut. The Department of the Interior also expressed uncertainty as to whether MTIC was the sole successor in interest of the aboriginal Mohegan Indian Tribe in Connecticut. At the time the BIA gave this testimony, the BIA was aware that the 1993 acknowledgment petition filed by Fortin was then pending, and was aware of irregularities that undermined the claim that MTIC was the sole successor in interest to the Mohegan Indian Tribe.

Notwithstanding this uncertainty as to MTIC's status as sole successor of the Mohegan Indian Tribe, the United States Congress enacted Public Law No. 103–377, the Mohegan Nation of Connecticut Land Claims Settlement Act of 1994.[6] The Settlement Act states that "The Mohegan Tribe of Indians of Connecticut is the successor in interest to the aboriginal entity known as the Mohegan Indian Tribe."[7] It extinguished "[a]ny claim to land within the State of Connecticut based upon aboriginal title by the Mohegan Tribe" and "[a]ny other claim to land that the Mohegan Tribe may have with respect to any public or private lands or natural resources in Connecticut, including any claim or right based on recognized title." The 1994 Settlement Act further provides that "[a]s used in this Act ... the term 'Mohe-

gan Tribe' means the Mohegan Tribe of Indians of Connecticut, a tribe of American Indians recognized by the United States pursuant to [BIA acknowledgment regulations]."[8] The Act also provides that "[u]pon publication of the determination and the State Agreement in the Federal Register pursuant to subsection (b) of this section, a transfer, waiver, release, relinquishment, or other commitment made by the Mohegan Tribe in accordance with the terms of the State Agreement shall be in full force and effect."[9]

To complicate matters further, in 1996, an unnamed "Third Attorney" entered an appearance in the federal court land claim suit, using the case caption *Mohegan Tribe of Indians of Connecticut v. Connecticut,* rather than *Mohegan Tribe v. Connecticut.* The "Third Attorney" represented to the court that the land claims of the Mohegan Tribe had not yet been extinguished pursuant to the terms of the Settlement Act. On December 30, 1996, under a stipulation of dismissal filed by the Third Attorney for MTIC and the State of Connecticut, the land claims suit was dismissed. This stipulation bore the caption *Mohegan Tribe of Indians of Connecticut v. State of Connecticut.* Neither MTIC or its counsel consulted with any other Mohegan Indians who were not members of MTIC prior to dismissing the land claims action.

In December 1994, the Department of the Interior approved the Gaming Compact, and published the approval at 59 Fed.Reg. 65,130 (Dec. 16, 1994). This was the "determination" referred to in the Settlement Act. However, the State Agreement was not published in the Federal Register as required by the Settlement Act. The United States has accepted title to the trust lands as described in the State

6. 25 U.S.C. §§ 1775—1775h (1994).

7. 25 U.S.C. § 1775(a)(1).

8. 25 U.S.C. § 1775a.

9. 25 U.S.C. § 1775b(1).

Agreement, and MTIC Gaming Authority has entered into management contracts and other agreements under which it has built and is operating the Mohegan Sun Casino.

Plaintiffs' amended complaint asserts seven counts against the various defendants. Counts One and Two seek declaratory relief interpreting the terms of the Settlement Act. Count One seeks a declaratory judgment against MTIC that by its terms, the extinguishment of land claims in the Settlement Act does not apply to any land claims of any tribe, band or group of Native Americans of Mohegan Ancestry except MTIC; that MTIC is not the sole successor in interest to the claims of the aboriginal Mohegan Tribe; and that any purported relinquishment of rights, including land claims, at the behest or consent of MTIC is null and void, and of no effect as to plaintiffs. Count Two seeks declaratory relief to the effect that as the State Agreement has never been published as required under the Settlement Act, 25 U.S.C. § 1775b(c)(1), the waiver of rights by the Mohegan Tribe and the commitments by the Mohegan Tribe are not effective.

Count Three seeks an imposition of a constructive trust on the proceeds of the Gaming Compact, which plaintiffs claim inures to the benefit of plaintiff NAM as well as defendant MTIC, and alleges that MTIC and the MTIC Gaming Authority have been unjustly enriched by the proceeds of the Gaming Compact.

Counts Four and Five relate to plaintiff's challenge to the Settlement Act itself. Count Four seeks declaratory relief that the 180 day statute of limitations in the Settlement Act is unconstitutional because it deprives plaintiffs of due process and violates the principle of separation of powers. Count Five challenges the merits of the Settlement Act, and seeks a declaratory judgment that the Act is unconstitutional, because it denies them equal protection of the laws, is an uncompensated taking of property without the provision of just compensation and is a taking of property not for public use.

Plaintiffs also claim a breach of trust by defendant United States as Count Six, in the event the Court grants the relief sought on Counts Four and Five, arguing that by recognizing MTIC as the sole successor in interest of the Mohegan Indian Tribe, the United States violated the trust obligation owed to plaintiff NAM and all individuals of Mohegan ancestry, community and traditions.

Finally, in Count Seven, plaintiff NAM seeks a judicial declaration that it is entitled to be, and is, a federally-recognized Indian Tribe.

Defendants MTIC and the Mohegan Tribal Gaming Authority ("Tribal Defendants"), the State of Connecticut and the United States of America, U.S. Department of the Interior, Gail Norton, Secretary, and James McDivitt, Acting Assistant Secretary for Indian Affairs ("Federal Defendants") have moved to dismiss. The Tribal Defendants and the State assert that they are immune from suit, and simultaneously claim to be indispensable parties requiring dismissal under Fed.R.Civ.P. 19(b). The Federal Defendants agree that the Tribal Defendants and the State are immune and indispensable, alternatively argue that the statute of limitations is not unconstitutional, thus barring judicial review of the Settlement Act, and finally urge the Court to require NAM to exhaust its administrative remedies prior to considering whether it qualifies for federal recognition.

Because the issues of immunity and alleged indispensability, if resolved in favor of the State and/or Tribal Defendants, require the Court to dismiss the action, the Court considers first the State's motion to dismiss based on sovereign immunity. The Court then turns to the Tribal Defen-

dants' motion to dismiss, and finally to the Federal Defendants' motion to dismiss.

## III. Discussion

### A. State's motion to dismiss

The State of Connecticut moves to dismiss the entire amended complaint, arguing first that suit against the State is barred by the doctrine of sovereign immunity, and second that the State is an indispensable party to all the Counts, therefore requiring dismissal with prejudice as to all defendants. The Court considers each of these arguments in turn.[10]

### 1. Sovereign immunity

■■■ The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state.

Although "its precise terms bar only federal jurisdiction over suits brought against one State by citizens of another States or foreign state,"[11] the Supreme Court " 'has understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms.' "[12] The Eleventh Amendment has thus been interpreted to bar suit in federal court against a state for either legal or equitable relief unless the state explicitly consents to suit, or Congress explicitly abrogates state immunity.[13] This bar rests on two principles: "first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent."[14] The sovereign immunity of the states extends to suits against a state by Indian tribes, notwithstanding the separate sovereign powers of the tribes.[15]

Plaintiffs argue first that because they are not seeking money damages against the State, the case should be allowed to go forward.[16] However, while the Supreme

---

**10.** Although plaintiffs argue that the Court should begin with the indispensability analysis because there is no need to reach the difficult issue of whether the State has waived its immunity if the Court concludes that the State is not indispensable, the claims must be dismissed as to it even if it is not indispensable if the State is entitled to sovereign immunity. Thus the Court begins with the sovereign immunity analysis and then proceeds to indispensability.

**11.** *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

**12.** *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (*quoting Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)).

**13.** *College Savings Bank*, 527 U.S. at 669, 119 S.Ct. 2219; *Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. 1114; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100, 104 S.Ct.

900, 79 L.Ed.2d 67 (1984); *McGinty v. New York*, 251 F.3d 84, 90 (2d Cir.2001).

**14.** *Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. 1114 (citations and internal quotations omitted).

**15.** *See id.; Blatchford v. Native Village of Noatak*, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).

**16.** Pl. Br. at 3 (*citing Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), and *Native Village of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548 (9th Cir. 1991)). In *Native Village of Venetie*, plaintiffs, Alaskan Native Villages and village members, sued the state and the commissioner of the state Department of Health and Social Services seeking to enjoin the state from refusing to recognize tribal court adoptions. 944 F.2d at 551. The Ninth Circuit held that plaintiffs' claims seeking retroactive relief were barred by the Eleventh Amendment, but also held that "the eleventh amendment does not bar

Court has held that the Eleventh Amendment does not bar actions against a state official alleging a violation of federal law where the plaintiff seeks as relief an injunction that governs future conduct,[17] plaintiffs here have sued the State, rather than a state official, and the Eleventh Amendment bar from suit against states or state agencies "exists whether the relief sought is legal or equitable."[18] Moreover, as the State notes, plaintiffs are not seeking prospective injunctive relief, but rather declaratory relief that the Settlement Act and the agreements entered into by the State and MTIC under that Act are either invalid or do not operate to extinguish Native American Mohegan's land claims.

Thus, the State is entitled to immunity unless Congress has properly abrogated that immunity or if the State has waived its immunity from suit.[19] At oral argu-

ment, the State conceded that in 1994 when the Settlement Act was enacted, it was quite possible that both Congress and the State believed either that the State had waived immunity or that Congress had abrogated the State's immunity through the enactment of § 1775h of the Settlement Act, which expressly permits jurisdiction in federal court over suits challenging the constitutionality of the Settlement Act or the validity of the underlying agreements. However, the State argues that intervening Supreme Court caselaw makes clear that neither abrogation or waiver has occurred.

Congressional abrogation of state immunity has been recognized as effective by the Supreme Court only when Congress "authorize[s] such a suit in the exercise of its power to enforce the Fourteenth Amendment—an Amendment enacted af-

---

the plaintiffs' request for injunctive relief against the Commissioner of the Department of Health and Social Services," *id.* at 552 (*citing Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). The court went on to consider whether plaintiffs' request for declaratory relief was barred by the state's immunity, and concluded that because "[n]ot only has Alaska refused to recognize the native village tribal court adoptions in the past, it continues to do so in the present, and will apparently continue to refuse recognition in the future[,] if this refusal is ultimately determined to be unlawful, the grant of declaratory relief can most properly be described as 'a mere case-management device that is ancillary to a judgment awarding valid prospective relief.' " *Id.* at 552 (*quoting Green*, 474 U.S. at 71, 106 S.Ct. 423). Accordingly, even though plaintiffs here may not be seeking money damages against the State, they are not seeking injunctive relief against any state official to prevent a continuing violation of federal law, and the declaratory relief sought here cannot fairly be characterized as ancillary to a judgment awarding valid prospective relief. Plaintiffs' attempt to evade the issue of sovereign immunity is therefore unavailing.

**17.** *Edelman v. Jordan*, 415 U.S. 651, 666–67, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**18.** *Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir.1991) (Although plaintiff's "claim for an injunction against DOCS is not barred by the Eleventh Amendment's ban on retroactive damage actions, it too must be dismissed because it does not follow the requirement, established in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that a plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly. . . ."). The Supreme Court recently noted that "the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment. . . The Eleventh Amendment does not exist solely in order to prevent federal-court judgments that must be paid out of a State's treasury; it also serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Seminole Tribe*, 517 U.S. at 58, 116 S.Ct. 1114.

**19.** *College Savings Bank*, 527 U.S. at 670, 119 S.Ct. 2219.

ter the Eleventh Amendment and specifically designed to alter federal-state balance." [20] The Settlement Act, however, was not enacted pursuant to Congress's Fourteenth Amendment powers, but rather its Article I power to "regulate commerce ... with the Indian Tribes," and this power has been held insufficient authority to abrogate state sovereign immunity.[21]

Plaintiffs argue, however, that the State waived its immunity through its participation in the process that led to the enactment of the Settlement Act. The " 'test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.' " [22] The Supreme Court has indicated that "[g]enerally, we will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the state makes a clear declaration that it intends to submit itself to our jurisdiction." [23] According to plaintiffs, because the State benefitted by the approval of the Settlement Act, and obtained the benefit of exclusive federal court jurisdiction for a limited 180 day period, it should be found to have constructively waived its immunity in exchange for the enactment of the Settlement Act.

Although plaintiffs recognize that the Supreme Court in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*,[24] held that a state's sovereign immunity could not be deemed con-

structively waived by the state's voluntary entry into interstate commerce, they argue that the alleged waiver here is more akin to the waiver in *Petty v. Tennessee–Missouri Bridge Commission*,[25] which the *College Savings Bank* Court distinguished as a permissible exercise of Congressional Article I power to extract a constructive waiver of sovereign immunity.[26] The Court explained that in *Petty*, the Court had held that a bi-state commission that had been created pursuant to an interstate compact had waived its immunity "by reason of a suability provision attached to the congressional approval of the compact." [27] The Court in *College Savings Bank* reasoned that because "[u]nder the Compact Clause, States *cannot* form an interstate compact without first obtaining the express consent of Congress[,] the granting of such consent is a gratuity." [28] In contrast, where Congress acted under its power to regulate interstate commerce, "what Congress threatens if the State refuses to agree to its condition is not the denial of a gift of a gratuity, but a sanction: exclusion of the State from otherwise permissible activity." [29]

■ The Court need not resolve whether an alleged waiver through the jurisdiction-granting provision contained in § 1775h of the Settlement Act is viable after *College Savings Bank*, however, because there is a more fundamental problem with plaintiffs' waiver argument. In *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*,[30] the Second Circuit consid-

**20.** *Id.* at 669, 119 S.Ct. 2219 (internal citations and quotations omitted).

**21.** *See Seminole Tribe*, 517 U.S. at 58–73, 116 S.Ct. 1114.

**22.** *Id.* at 675, 119 S.Ct. 2219 (*quoting Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)).

**23.** *Id.* (internal citations and quotations omitted).

**24.** 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

**25.** 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959).

**26.** 527 U.S. at 686, 119 S.Ct. 2219.

**27.** *Id.*

**28.** *Id.*

**29.** *Id.*

**30.** 280 F.3d 98, 112–13 (2d Cir.2001).

ered the issue of waiver in the context of determining whether Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act could be applied against non-consenting states. In that case, the court found that while the statutory "provision constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity, that conclusion alone is not sufficient for us to find that New York actually waived its sovereign immunity in accepting federal funds for SUNY." [31] The court continued: "[a]s is the case with the waiver of any constitutional right, an effective waiver of sovereign immunity requires an 'intentional relinquishment of a *known* right or privilege.'" [32] Applying "'every reasonable presumption against waiver,'" the Second Circuit found that because it was understood at the time New York accepted the funds that Congress could abrogate a state's sovereign immunity under its Commerce Clause authority, "a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning sovereign immunity from private damages suits, since by all reasonable appearances state sovereign immunity had already been lost." [33] Under this reasoning, the waiver argument urged by plaintiffs must be rejected, as the State could not have known until 1996, when *Seminole Tribe* was decided, that the Indian Commerce Clause was not a proper basis for abrogation of immunity, and therefore the Court cannot find a knowing waiver of sovereign immunity.

As the enactment of the Settlement Act was not a permissible Congressional abrogation of state immunity and the Act contains no clear declaration of waiver by the State, plaintiffs' claims against the State are barred by sovereign immunity and must be dismissed as to the State. The Court next turns to the second part of the State's argument, that it is a necessary and indispensable party to all seven Counts of the Amended Complaint under Fed.R.Civ.P. 19, and that its dismissal therefore requires dismissal of the entire case.

### 2. Rule 19 Necessary and Indispensable Parties

Rule 19 provides that:

(a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the person's already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent judgment obligations by reason of the claimed interest. . . .

(b) If a person as described [above] cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be

---

**31.** *Id.* 280 F.3d at 113–14.

**32.** *Id.* 280 F.3d at 114 (*quoting College Savings Bank,* 527 U.S. at 682, 119 S.Ct. 2219) (emphasis in original).

**33.** *Id.* (citations omitted).

prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

### i. Necessary party

■ As the State correctly notes, plaintiffs seek to render void the State's rights under the Settlement Act and the State Agreement as to the extinguishment of Mohegan land claims against the State. Thus, as to Counts One, Two, Four and Five, the State is clearly a necessary party, as continued adjudication of this dispute in the State's absence could certainly impair the State's interests in the event the Court ruled in plaintiffs' favor on any of these claims.[34] In addition, the State claims that it is a necessary party to Count Seven, in which plaintiffs seek a judicial determination that they are a federally-recognized tribe. Although the State concedes that the relief sought—federal recognition—is available without State participation, the State has a strong interest in the question of federal recognition in light of the benefits, including gaming rights, conferred by that status, and argues that its interest in ensuring that the BIA process is followed may be impaired if this action goes forward. The Court therefore finds that the State is a necessary party to Count Seven as well.

In contrast, the State has not shown that it is a necessary party to Count Three, which alleges that MTIC has been unjustly enriched by the casino proceeds, and seeks the imposition of a constructive trust. A ruling in plaintiffs' favor on this Count would not necessarily call into question the validity of the State Agreement or Settlement Act, nor would it necessarily result in granting plaintiffs a right to pursue land claims against the State. However, the Court's conclusion, *see infra* pages 36—37, that the Tribal Defendants have not waived immunity from suit as to Count Three and are both necessary and indispensable parties as to that Count, requires dismissal of that Count, and the Court therefore need not resolve whether the State is a necessary or indispensable party to Count Three.

### ii. Indispensable party

Because the State is a necessary party, Rule 19(b) requires the Court to determine whether to proceed in the State's absence or simply dismiss the Counts to which the State is necessary and cannot be joined.[35] The four factors outlined in Rule 19(b)—the possible prejudice to the State, the extent to which that prejudice may be lessened, whether a judgment rendered in the State's absence would be adequate, and finally, the availability of an alternate remedy for plaintiffs if the case is dismissed—must be assessed on a case by case basis, "in equity and good conscience." [36]

■ The State argues that as the validity of the extinguishment of land claims pursuant to the Settlement Act and State Agreement depends on the upholding of

---

**34.** *Cf. Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 545 (2d Cir.1991) (Seneca Nation was necessary party to suit challenging constitutionality of Seneca Nation Settlement Act of 1990 and a lease agreement approved by that Act because "[a]s a party to an Agreement negotiated over two decades, the Nation's interest in the validity of the lease agreement in significant.").

**35.** *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

**36.** Fed.R.Civ.P. 19(b).

the Settlement Act, it will be severely prejudiced if Counts One, Two, Four and Five, which challenge the State Agreement and/or the constitutionality of the Settlement Act, go forward in its absence. In support of this position, the State relies on *Fluent v. Salamanca Indian Lease Authority*, in which the Second Circuit noted that:

> It has been held that when an indispensable party is immune from suit, there is very little room for the balancing of other factors set out in rule 19(b), because immunity may be viewed as one of those interests compelling by themselves. The rational behind the emphasis on immunity in the weighing of rule 19(b) factors is that the case is not one where some procedural defect such as venue precludes litigation of the case. Rather, the dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.[37]

More recently, however, the Second Circuit has rejected the automatic application of *Fluent* to support a finding of indispensability whenever claims are dismissed against one defendant based on sovereign immunity. In *Bassett v. Mashantucket Pequot Tribe*, the court vacated the dismissal of copyright and tort claims on indispensability grounds against the nontribal defendants, noting that *Fluent* was inapposite because "[t]he nature of the relief sought by plaintiffs in *Fluent* made clear that the Seneca was indispensable to the action; each facet of the declaratory judgment sought by the plaintiffs in *Fluent* inextricably implicated the interests of the Seneca, in whose absence the action could not proceed 'in equity and good conscience.'"[38]

The Court concludes that the State is indispensable to the adjudication of Counts One and Two, which seek declaratory relief as to the meaning of the Settlement Act, and which relief, if granted, would result in a declaration that plaintiffs' land claims are extant, and would, of necessity, undermine the State Agreement.[39] The State's interest here is identical to that asserted in *Fluent*, no other party shares the State's interest in protecting the State against the assertion of land claims by plaintiffs, and the prejudice to the State if these Counts were to be allowed to go forward is significant. While the Court notes the claimed lack of any other available forum for plaintiffs,[40] the Court nonetheless is persuaded that the equities support the finding that the State is indispensable to Counts One and Two, which must therefore be dismissed.

However, the Court also finds that the State is not indispensable to adjudication of Counts Four and Five, which directly challenge the constitutionality of the Settlement Act itself. Although the Court appreciates that the State does have a strong interest in the Settlement Act being upheld, the State has not offered any reason to think that either the Federal or Tribal Defendants could not adequately represent their interests in that respect, and thus the State has not shown any real

---

**37.** 928 F.2d at 548 (internal citations and quotations omitted).

**38.** 204 F.3d 343, 359 (2d Cir.2000).

**39.** *See Crouse–Hinds Co. v. InterNorth, Inc.,* 634 F.2d 690, 701 (2d Cir.1980) (parties to a contract are indispensable parties to suit challenging validity of contract) (citations omitted).

**40.** It is unclear, however, that plaintiffs could not achieve the result they seek simply by filing a land claims suit. In the likely event that any defendant (including the State) were to raise the Settlement Act in defense, plaintiffs could then argue that the language of the Act does not foreclose their claims, thereby achieving a declaration of the meaning of the terms of the Settlement Act.

prejudice to it if these Counts go forward in its absence.[41] In addition, complete relief can be awarded in the State's absence, as plaintiffs simply seek a declaration of unconstitutionality of the Settlement Act. Finally, although "[t]he lack of a forum does not automatically prevent dismissal of the claims asserted,"[42] the paramount federal interest in ensuring the reviewability of constitutional challenges to federal statutes remains a factor to consider in the Court's balancing of the equities, as plaintiffs have no other available forum in light of the exclusive federal jurisdiction granted by § 1775h.[43] Under these circumstances, particularly because the State's interest in upholding the constitutionality of the statute has not been shown to deviate from that of the Federal Government's such that the State would suffer prejudice from adjudication in its absence, the Court concludes that the equities favor retention of jurisdiction over Counts Four and Five.

As for Count Seven, although the State has expressed an interest in NAM not gaining federal tribal recognition, the State's primary concern appears to be that it would lose the comment opportunity provided by the BIA process. However, there is no reason that relief could not be fashioned in such a way as to permit comment by the State, should it so choose. Moreover, adequate relief can be afforded in the State's absence. The Court concludes that these factors counsel against dismissal on indispensability grounds, although whether plaintiff has an adequate alternative forum, in the BIA process, is discussed at greater detail below at pages 48—51, in the context of the Federal Defendants' motion to dismiss.

**B. Tribal Defendants' motion to dismiss**

The Tribal Defendants have moved to dismiss Counts One through Six on the grounds that they are entitled to sovereign immunity and are indispensable parties under Rule 19(b). In response, plaintiffs contend that their claim to represent the

---

**41.** Buttressing this conclusion is the fact that the State has adopted the Federal Defendants' arguments on the constitutionality of the statute of limitations in the course of this litigation, thus presenting an alignment of interest.

**42.** *Fluent*, 928 F.2d at 547.

**43.** *See, e.g., Shenandoah v. United States Dep't of Interior*, 159 F.3d 708, (2d Cir.1998) (noting that dismissal on the grounds that a tribe was an indispensable party could be inconsistent with the judiciary's duty to review federal agency determinations); *Marozsan v. United States*, 852 F.2d 1469, 1472–73 (7th Cir.1988) (noting importance of judicial review of constitutional challenges to federal legislation); *Bartlett v. Bowen*, 816 F.2d 695, 703 (D.C.Cir. 1987) ("a statutory provision precluding all judicial review of constitutional issues removes from the courts an essential judicial function under our implied constitutional mandate of separation of powers, and deprives an individual of an independent forum for the adjudication of a claim of constitutional right"). *But cf. Citizen Potawatomi Nation v. Norton*, 248 F.3d 993 (10th Cir.2001) (noting that dismissal of tribe on sovereign immunity grounds leads to the "anomalous" result that no one (except the tribe) could challenge the legislation, but concluding that district court did not abuse discretion in dismissing action).

On the importance of judicial review of constitutional challenges generally, *see, e.g., Preseault v. ICC*, 853 F.2d 145, 149 (2d Cir. 1988) (noting that "[e]ven where judicial review of agency decisions has been prohibited by statute, challenges to the constitutionality of the underlying statute have been permitted") (citing cases); *see also Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (abstention appropriate because plaintiff would have review of constitutional challenge to state regulation in state administrative proceeding); *Cullen v. Fliegner*, 18 F.3d 96, 103 n. 4 (2d Cir.1994) (abstention appropriate only where "the federal plaintiff [has] an adequate opportunity for judicial review of his constitutional claims during or after the proceeding").

interests of the aboriginal Mohegan Indian Tribe, and their subsequent waiver of the sovereign immunity of the Mohegan Indian Tribe, effectively waives the sovereign immunity of the Tribal Defendants. Plaintiffs further assert that tribal immunity is improperly invoked here, where the question of plaintiffs' status as a legal successor to the historic Mohegan Indian Tribe is at issue. Alternatively, plaintiffs argue that the immunity of the Tribal Defendants has been impliedly divested because it interferes with the requirements of the national government by making the Settlement Act unreviewable, and that MTIC has waived sovereign immunity by virtue of its procurement of the Settlement Act. Finally, plaintiffs argue that even if the Tribal Defendants are immune from suit, they are not necessary and indispensable parties and the case may go forward against the Federal Defendants.

### 1. Tribal sovereign immunity

 "It is by now well established that Indian tribes possess the common-law immunity from suit traditionally enjoyed by sovereign powers."[44] That immunity may be waived either by Congress or the tribe itself. However, "[t]o abrogate tribal immunity, Congress must 'unequivocally'

express that purpose. Similarly to relinquish its immunity, a tribe's waiver must be 'clear.'"[45]

 Plaintiffs argue that the Court should find an implied waiver of sovereign tribal immunity because the State and MTIC co-drafted, co-sponsored and promoted the passage of the Settlement Act, which granted exclusive federal jurisdiction over controversies challenging the constitutionality of the Settlement Act. At oral argument, counsel for the Tribal Defendants stated that MTIC had waived its immunity from suits challenging the constitutionality of the Settlement Act, consistent with the limitations on scope of review and the statute of limitations period provided in § 1775h of the Act.[46] Thus, MTIC does not claim immunity as to Counts Four and Five, challenging the constitutionality of § 1775h and the Settlement Act itself.[47] However, for the reasons discussed below, the Court concludes that MTIC is immune with respect to the remaining Counts.

According to plaintiffs, under *Shenandoah v. United States Dep't of the Interior*,[48] this Court should find that "the sovereign immunity of the historic Mohegan Tribe is effectively waived by Plaintiffs,

---

**44.** *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 356 (2d Cir.2000).

**45.** *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe*, 532 U.S. 411, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001) (*citing Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)); *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991); *Garcia v. Akwesasne Housing Auth.*, 268 F.3d 76, 84–85 (2d Cir.2001); *see also Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 546 (2d Cir.1991) ("When Congress has chosen to limit or waive the sovereign immunity of Indian tribes, it has done so in clear language.").

**46.** *Cf. C & L Enterprises*, 121 S.Ct. at 1595 (holding that a tribe that had entered into a construction contract with an arbitration provision requiring arbitration of all contract-related disputes and permitting judicial enforcement of any arbitration award "in accordance with applicable law in any court having jurisdiction thereof" could not claim sovereign immunity to avoid enforcement of an arbitration award against it because it had agreed "by express contract, to adhere to certain dispute resolution procedures," notwithstanding the lack of any express waiver of immunity in the contract).

**47.** MTIC has adopted the Federal Defendants' arguments in favor of dismissal of those Counts, discussed below.

**48.** 159 F.3d 708, 714–15 (2d Cir.1998).

through their allegations that they purport to represent the historic Mohegan Tribe." [49] Thus, plaintiffs' logic goes, because tribal sovereign immunity may exist regardless of federal recognition, and a tribe may have more than one modern day legal successor, NAM may claim and subsequently waive the sovereign immunity of the historic Mohegan Tribe, thus rendering MTIC subject to suit by NAM. Where the issue of what entity is entitled to claim sovereign immunity is the ultimate issue in the case, plaintiffs argue, dismissal on sovereign immunity grounds is inappropriate. Plaintiffs' argument turns on the answers to two questions: who may assert the sovereign immunity of the historic Mohegan Tribe? and who may waive that sovereign immunity?

In *Shenandoah,* the Second Circuit upheld dismissal for failure to exhaust administrative remedies in a suit brought by a group of members of the Oneida Nation, some of whom claimed to be the Nation's traditional leaders, against the Department of the Interior and the Oneida Nation member recognized by the Department as the Nation's representative, seeking, *inter alia,* an accounting and a return of net profits from all the Nation's assets under the recognized representative's control.[50] The Second Circuit also went on to express in *dicta* its disagreement with the district court's conclusion that the case should be dismissed because plaintiffs had failed to sue the Oneida Nation, which could not be joined because of its sovereign immunity:

> Assuming that the Nation is indispensable to the suit, it is not clear to us that the Nation is an absent party. The plaintiffs purport to represent (and

thereby waive the immunity of) a sovereign Native American Nation. The district court's observation that 'if plaintiffs possessed authority to waive sovereign immunity, then they would also possess the power to themselves fashion the relief they seek from the district court,' disregards the possibility that [the recognized representative] improperly usurped control over the Nation.

Because the issue of who represents the Oneida Nation after [the recognized representative's] second purported removal has not been determined by the Department ... the district court prematurely determined that plaintiffs do not represent the Nation and therefore that the Nation is an absent party.[51]

Here, in contrast, the dispute is not over whether Courtland Fowler and MTIC or Eleanor Fortin and NAM properly represent the aboriginal Mohegan Indian Tribe. There is no allegation questioning the recognition of MTIC as a successor to the aboriginal Mohegan Tribe. The critical distinction between this case and *Shenandoah* is that here, NAM and the individual plaintiffs have brought suit directly against MTIC, a federally-recognized tribe, which asserts its own claim to sovereign immunity, and there is no challenge to the legitimacy of that immunity. *Shenandoah* does not stand for the principle that this Court can ignore the fact that MTIC is named as a defendant and instead pretend it is absent, permit NAM to claim and waive MTIC's immunity, and then find that MTIC cannot claim its immunity because NAM has waived it. Although plaintiffs correctly note that a tribal group may be entitled to sovereign immunity absent federal recognition,[52] plaintiffs' *Shenandoah*

---

49. Pl. Br. at 1.

50. 159 F.3d at 711–13.

51. *Id.* at 715.

52. *See Native Village of Tyonek v. Puckett,* 957 F.2d 631, 634–35 (9th Cir.1992) ("An Indian community constitutes a tribe [entitled to sovereign immunity] if it can show that (1) it is recognized as such by the federal govern-

argument fails to recognize that MTIC has a claim to a *separate* tribal immunity than NAM may ultimately enjoy, notwithstanding that each faction's claim to immunity may ultimately derive from the historic sovereignty of the aboriginal Mohegan Indian Tribe.[53]

Similarly, plaintiffs' reliance on *Cherokee Nation of Oklahoma v. Babbitt,*[54] for the proposition that sovereign immunity "is improperly invoked where tribal sovereignty is the ultimate issue" is misplaced because tribal sovereignty is *not* the ultimate issue here. In *Cherokee Nation,* the plaintiff Cherokee Nation sued the Secretary of the Interior alleging that the BIA's recognition of the Delaware Tribe of Indians violated the Department of the Interior's regulations. The D.C. Circuit held that although the Delaware Tribe was a necessary and indispensable party to the lawsuit, the Delaware Tribe could not claim sovereign immunity vis-a-vis the Cherokee Nation because the Delawares allegedly had been "incorporated" into the Cherokee Nation pursuant to an 1866 treaty.[55] Although the Delaware Tribe had been granted federal recognition, and such recognition would "ordinarily suffice to establish that the group is a sovereign power entitled to immunity from suit,"[56] because

the Cherokee Nation's complaint alleged that the Delaware were improperly recognized in violation of the Department's own regulations, and in violation of the 1866 treaty, the court concluded that the Department's federal recognition determination could not be assumed to be valid and thus the court was required to determine whether the Delaware Tribe had retained its sovereignty.[57] The court also relied on the principle, noted in *Shenandoah,* that "were the court to decline to review the district court's sovereign immunity ruling, then the Department's recognition decisions would be unreviewable, contrary to the presumption in favor of judicial review of agency action" to conclude that sovereign immunity based on federal recognition "is thus inappropriately invoked when tribal sovereignty is the ultimate issue."[58]

As noted, plaintiffs here challenge only MTIC's claim to be the *sole* successor of the Mohegan Indian Tribe with the authority to compromise the land claims of the historic Mohegan Tribe—they do not claim that MTIC is not *a* proper successor.[59] Unlike *Cherokee Nation,* there is no argument that MTIC's federal recognition is invalid such that this Court should decline to rely on that recognition as a basis for finding MTIC to be entitled to sovereign immunity.[60]

---

ment, or (2) it is 'a body of Indians of the same or a similar race united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory.' ") (citations omitted).

**53.** Contrary to plaintiffs' position, *Shenandoah* did not state that the Oneida Nation itself lost its immunity as a result of plaintiffs' allegations, but only indicated that—to the extent the Nation was indispensable to a claim of who properly represents the Nation—plaintiffs' allegations that *they* represented the Nation were sufficient to permit the fiction that the Nation was present.

**54.** 117 F.3d 1489, 1499 (D.C.Cir.1997).

**55.** *Id.* at 1503.

**56.** *Id.* at 1499.

**57.** *Id.*

**58.** *Id.*

**59.** *See* Pl. Br. at 8 n. 2.

**60.** Plaintiffs also argue that under *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), this Court should find that the sovereignty of MTIC has been "impliedly divested" by virtue of the overriding federal interest in judicial review of Congressional acts. *Wheeler* was a case involving an allegation that prosecution under both tribal and federal law constituted double jeopardy, and discussed the implied divestiture of tribal sovereignty itself, not of tribal sovereign immunity.

As the immunity asserted by MTIC has not been waived, the Court must therefore consider whether MTIC is a necessary and indispensable party under Fed.R.Civ.P. 19.

### 2. Necessary and Indispensable Parties

██ Because the Court has already found that Counts One and Two must be dismissed on Rule 19(b) grounds in the absence of the State, and that the Tribe has waived immunity as to the constitutional challenge to the Settlement Act, the Court considers only whether Count Three must be dismissed in the Tribal Defendants' absence.[61] MTIC is clearly both necessary and indispensable to Count Three, which alleges that plaintiffs are entitled to the proceeds resulting from the gaming compact between MTIC and the State, and that MTIC has been unjustly enriched thereby. The relief sought is the imposition of a constructive trust on MTIC's proceeds from the Mohegan Sun casino. In MTIC's absence, adequate relief is impossible, the prejudice to MTIC is plain, neither the State nor the Federal Defendants is capable of representing MTIC's interests in ensuring that it alone receives the benefits of the casino proceeds, and, while plaintiffs may lack an alternate forum for pursuit of this particular remedy, that factor does not carry the day here.[62] Count Three must therefore be dismissed.

### C. Federal defendants' motion to dismiss

### 1. Statute of limitations

Count Four of plaintiffs' Amended Complaint alleges that the 180 day statute of limitations in the Settlement Act is unconstitutionally short. Unless the statute of limitations is found unconstitutional, plaintiffs' substantive constitutional challenges to the Settlement Act in Count Five (denial of equal protection and taking without compensation and not for public purpose) are time barred. The Federal Defendants have moved to dismiss these Counts, arguing that the statute of limitations is constitutional and reasonably related to the purpose of providing finality and quieting clouds on title to land in Connecticut. In response, plaintiffs argue that the limitations period is not reasonably related to any permissible purpose and alternatively, that because their claims were not ripe within the 180 day period, the limitations period deprives them of due process.

██ Generally, "Congress may impose a constraint or duty on vested property rights if its action is rationally related to a legitimate governmental interest." [63] In addition, "[s]tatutes of limitations affecting existing rights are constitutional if a 'reasonable time is given for the commencement of the action before the bar takes effect.' " [64] Although the reasonableness of the time period is primarily a judgment for the legislature, a statute of

---

**61.** The Tribal Defendants do not claim to be a necessary or indispensable party to Count Seven, which seeks a judicial declaration that NAM is a federally-recognized tribe.

**62.** *Fluent,* 928 F.2d 542, 547 (2d Cir.1991) (citations omitted); *see also Confederated Tribes of the Chehalis Indian Reservation v. Lujan,* 928 F.2d 1496, 1500 (9th Cir.1991) ("Courts have recognized that a plaintiff's interest in litigating a claim may be outweighed

by a tribe's interest in maintaining its sovereign immunity.").

**63.** *Littlewolf v. Hodel,* 681 F.Supp. 929, 939 (D.D.C.1988).

**64.** *Id.,* at 939–40, *aff'd,* 877 F.2d 1058 (D.C.Cir.1989) (*quoting Terry v. Anderson,* 95 U.S. (5 Otto) 628, 632, 24 L.Ed. 365 (1877)); *accord Te–Moak Bands of Western Shoshone Indians of Nevada v. United States,* 18 Cl.Ct. 82, 89 (1989).

limitations may violate due process where it "is manifestly so insufficient that the statute becomes a denial of justice." [65] However, "[a]s long as the statute is reasonable under all the circumstances-and, particularly, in light of the situation or emergency that impelled enactment of the law-the time bar comports with concepts of due process." [66]

In *Littlewolf v. Hodel*, members of an Indian tribe challenged the constitutionality of a statute of limitations barring claims for the value of land allotments under a tribal settlement act if the claims were not filed within the latter of 180 days or before certification by the Secretary that certain events had occurred. [67] The court noted that "there is nothing presumptively unreasonable about this limitations period; courts have upheld statutes of limitations barring suit within similarly short periods of time." [68] The court also concluded that

The limitations period is unquestionably reasonable in light of the legislative goals of underlying the White Earth [Settlement Act]. The Act was a response to [a case which] clouded title to hundreds of thousands of acres of Minnesota land. The White Earth Act attempts to quiet title to this vast area of Minnesota by encouraging either prompt suit by the heirs of the Indian allottees or acceptance of a monetary settlement for the heirs' land claims. Given the great social interest in quickly righting the wrongs done to the White Earth Band and in clearing title to so vast an area with equal speed, the limitations period appears reasonable. [69]

#### i. The purpose of § 1775h

In arguing that the 180 day limitations period is unconstitutional here, plaintiffs rely on the existence of § 1775g of the Settlement Act, which states that:

[i]f, during the 15–year period beginning on the date on which the Secretary publishes a determination pursuant to section 1775b(b) of this Title, the State Agreement is *invalidated by a court of competent jurisdiction* . . . (1) the transfers, waivers, releases, relinquishments, and other commitments made by the Mohegan Tribe under section 1(a) of the State Agreement shall cease to be of any force or effect; (2) section 1775b of this title [extinguishing the land claims] shall not apply to the lands or interests in lands or natural resources of the Mohegan Tribe or any of its members, and the title to such lands or interests in lands shall be determined as if such section were never enacted . . . .

According to plaintiffs, because § 1775g contemplates the exercise of jurisdiction long after the 180 day period would have expired, it undermines defendants' claims of necessity of a limited time period to provide finality and quiet title.

The intersection between 25 U.S.C. §§ 1775g and 1775h is admittedly less than clear, and neither the legislative history nor the defendants has provided a wholly persuasive explanation for the apparent inconsistency. The legislative history of the Act suggests that § 1775g was added to balance the concerns of the Mohegan Tribe, which sought a nullification provision because by relinquishing its land

**65.** *Wilson v. Iseminger*, 185 U.S. 55, 63, 22 S.Ct. 573, 46 L.Ed. 804 (1902).

**66.** *Id.* (*citing Texaco v. Short*, 454 U.S. 516, 528, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982); *Atchafalaya Land Co. v. F.B. Williams Cypress Co.*, 258 U.S. 190, 197, 42 S.Ct. 284, 66 L.Ed. 559 (1922)).

**67.** 681 F.Supp. at 939.

**68.** *Id.*

**69.** *Id.* at 940.

claims through the Settlement Act before the State and federal government fulfilled their obligations, it risked losing its land claims without any guarantee that it would receive the benefit of the casino,[70] and the title insurers (represented by the American Land Title Association), who were concerned that an open-ended nullification period would leave landowners permanently subject to a threat of land claims, and sought a "date certain in the reasonably near future when homeowners in Connecticut will know whether or not their land is threatened by a Mohegan claim."[71]

The language of § 1775h, which grants exclusive jurisdiction over challenges to the "validity of any agreement entered into under the authority of this subchapter or approved by this subchapter" to the District of Connecticut and allows only suits filed within a limited 180 day period, perhaps could have been expected to have provided sufficient assurance to the title insurers that no temporally or geographically distant court action could invalidate the agreements and trigger the nullification provision. Thus, plaintiffs' argument goes, the existence of § 1775g despite the language of § 1775h suggests that § 1775h cannot be read to provide the exclusive basis for jurisdiction. However, the fact that, for reasons that are unclear from the legislative history, the title insurers sought an additional guarantee, in the form of the fifteen year window, does not change the fact that § 1775g does not itself grant jurisdiction or otherwise authorize litigation during the contemplated fifteen year period. Instead, it states only that if some court of competent jurisdiction were to invalidate the gaming compact or the State Agreement, MTIC's land claims are to be revived only if that invalidation occurs within the fifteen year period. Thus, in light of the plain language of § 1775h, the Court does not find that § 1775g compels the conclusion argued by plaintiffs.

There nonetheless remains some difficulty with defendants' argument that the purpose of the limited 180 day period of § 1775h is to promptly settle clouds on title, if only for the obvious reason that the Mohegan land claims were not immediately extinguished by the passage of the Act or the expiration of the 180 day period.[72] However, the structure of the Settlement Act suggests that the purpose of the 180 day statute of limitations should be examined in terms of its relationship to the overall purpose of the Act—facilitating both the settlement of claims against the State of Connecticut by the Mohegan Tribe and the removal of clouds on title arising out of such claims.[73]

---

70. *See* Statement of Ralph W. Sturges, Chief of the Mohegan Nation of Connecticut, before the Senate Indian Affairs Committee, Regarding S. 2329 (Aug. 1, 1994).

71. *See* Statement Regarding the Views of the American Land Title Association, on S. 2329 (July 29, 1994). The Senate Report provides additional explanation of the purpose of § 1775g. *See* Senate Report No. 103–339, Mohegan Nation of Connecticut Land Claim Settlement, 103rd Cong., 2d Sess.1994 ("By limiting the period during which the settlement agreement and related statutory provisions can be invalidated [to 15 years], the Congress promotes its stated policy of insuring that, at the expiration of the limitations period, the clouds on and titles resulting from the Mohegan claims will be removed.").

72. *See* 25 U.S.C. § 1775b. In fact, in support of their argument that plaintiffs' takings claims are unripe, the Federal Defendants contend that the land claims have not (to date) been extinguished because the Secretary has yet to publish the determination required by the Act.

73. *See* Senate Report No. 103–339, Mohegan Nation of Connecticut Land Claim Settlement, 103rd Cong., 2d Sess.1994 ("S. 2329, the Mohegan Nation of Connecticut Land Claims Settlement Act, is intended to facilitate the settlement of claims against the State of Connecticut by the Mohegan Tribe and to facilitate the removal of any encumbrance to any title to land in the State of Connecticut arising out of such claims.").

The narrow and exclusive 180 day period in which to file suit suggests that Congress was concerned with ensuring that there be a short, finite period in which the Settlement Act itself could be declared unconstitutional. During this limited period, the State, tribe and Town of Montville could begin to take the steps outlined in the Settlement Act that would ultimately lead to a final resolution of the clouds on title and an extinguishment of the Mohegan land claims. By allowing only a short period for challenges to the Settlement Act, Congress ensured that the parties would not have advanced too far along in the event the Act or any portion thereof was struck down. Absent such a provision, in contrast, the entire process could be disrupted at any time, thereby severely damaging the reliance interests of all the parties involved.[74]

ii. § 1775h comports with due process

Alternatively, plaintiffs argue that because their constitutional claims did not become ripe during the 180 day period, the statute of limitations is *per se* unreasonable and a violation of due process, denies them access to the courts and violates separation of powers. Plaintiffs' ripeness theory adopts an argument made by the Federal Defendants against the substantive takings claim, maintaining that absent actual extinguishment of the land claims any takings claim is premature. The State argues that all claims were ripe and could have been brought in 1994, while the Federal and Tribal Defendants maintain that only the equal protection challenge was ripe prior to extinguishment of the land claims.[75]

---

**74.** *See Paul v. Andrus,* 639 F.2d 507, 509 (9th Cir.1980) (Alaska Native Claims Settlement Act's one year statute of limitations not unreasonable because "Congress's concern that [the Act's] legality be determined quickly and with certainty was consistent with the needs of the entire Act."); *see also Narragansett Indian Tribe v. National Indian Gaming Comm'n,* 158 F.3d 1335, 1339 (D.C.Cir.1998) (purpose of similar 180 day statute of limitations in Rhode Island settlement act was "to ensure that any suits challenging the validity of the Settlement Act were brought quickly and heard by the court most familiar with the issues"). The D.C. Circuit in *Narragansett Indian Tribe* also noted that:

the Alaska Native Claims Settlement Act, upon which Congress modeled the Rhode Island Settlement Act, contains the same language as section 1711 [and § 1775h of the Settlement Act at issue here], adding: "The purpose of this limitation on suits is to insure that, after the expiration of a reasonable period of time, the right, title, and interest of the United States, the Natives, and the State of Alaska will vest with certainty and finality...." 43 U.S.C. § 1609(a) (1994) (emphasis added). Of course, section 1711 [and § 1775h] contains no such explanation. But because the section uses precisely the same jurisdictional language as the Alaska Settlement Act, and because the Rhode Island Settlement Act has essen-

tially the same purpose, we think Congress intended section 1711's time and jurisdiction limitations likewise to apply only to constitutional suits challenging the original land settlement.

*Id.*

**75.** Plaintiffs' ripeness argument runs the risk of proving too much, as they necessarily disagree with the Federal Defendants' position that the takings claims are still not ripe and therefore unjusticiable. Plaintiffs argue that their takings claims, though unripe within the 180 day period following the enactment of the Settlement Act, became ripe when the original land claim suit filed by John Hamilton was dismissed by Judge Peter C. Dorsey with the approval of a stipulation of dismissal on December 30, 1996. However, that stipulation simply provided that "All land claims of the Mohegan Tribe are extinguished *as provided for by the Mohegan Land Claims Settlement Act* and Settlement [State] Agreement," and according to plaintiffs themselves, under the Settlement Act, the claims will not actually be extinguished until the publication of the Secretary's determination. Plaintiffs' argument thus conflates the "dismissal" of the claims by court order approving the stipulation with the "extinguishment" of the claims, which occurs with the fulfilment of the conditions set forth in the Settlement Act.

Ripeness is a "constitutional prerequisite to exercise of jurisdiction by federal courts." [76] "[R]ipeness is peculiarly a question of timing," [77] intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." [78] Its purpose is to forestall judicial determinations of disputes until they are presented in a concrete form.[79] "The ripeness doctrine protects the government from judicial interference until a decision has been formalized and its effects felt in a concrete way by the challenging parties." [80] However, where an issue involves a purely legal question that does not require further factual development, argument in favor of deferring adjudication until a latter time is less persuasive.[81]

Plaintiffs argue that there is a distinction between the liability producing act, the enactment of the Settlement Act, and damages, the actual extinguishment of their land claims without compensation, and claim that until they suffer injury, the claims are not ripe. Examined carefully, plaintiffs' equal protection challenge to the Act is premised on the position that by defining MTIC as *the* successor in interest to the aboriginal entity known as the Mohegan Indian Tribe," the Act impermissibly favored MTIC over plaintiffs. Their takings argument is similarly premised on their position that excluding NAM and the individual plaintiffs from the class of those entitled to land claims (through the definition of MTIC as the successor in interest), absent compensation, is impermissible. The ripeness of this particular takings claim does not, therefore, turn on whether the land claims of the aboriginal Mohegan Tribe have yet been extinguished, but rather depends on the purely legal assessment of whether the statute's recognition of MTIC as "the successor in interest," with no compensation for other alleged successors such as plaintiffs, is a taking without just compensation. This claim, like the equal protection claim, therefore would have been cognizable within the 180 day period.

Apart from the unavailing ripeness argument, no other reason has been offered why plaintiffs could not have filed their claims within the statutory limitations period that might suggest that the six-month period was constitutionally inadequate. As the Federal Defendants note, plaintiffs have provided no explanation for their failure to file this suit until October 18, 2000 (almost six years after enactment of the Settlement Act).

According to plaintiffs' allegations in their amended complaint, their land claim suit, filed in 1977, was co-opted by the MTIC faction in 1996 when the caption was changed and the claims were voluntarily dismissed with prejudice. The federal acknowledgment petition, originally filed in 1978, and supplemented in 1990

**76.** *Nutritional Health Alliance v. Shalala,* 144 F.3d 220, 225 (2d Cir.1998); *accord Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 51 (2d Cir.1980).

**77.** *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974),

**78.** *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

**79.** *See Renne v. Geary,* 501 U.S. 312, 322, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (*citing Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 584, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947)).

**80.** *Thomas v. City of New York,* 143 F.3d 31, 34 (2d Cir.1998) (internal citations and quotations omitted).

**81.** *See Nutritional Health Alliance,* 144 F.3d at 227.

following a preliminary BIA denial of recognition, was finally granted on behalf of MTIC in 1994, after Ms. Fortin filed her own petition on behalf of the Mohegan Tribe and Nation, Inc. (which petition has since been, the Court notes somewhat ironically in light of the events giving rise to this litigation, adopted by plaintiff NAM as *its* own following a schism within the Mohegan Tribe and Nation, Inc.). Plaintiffs have offered no explanation for their silence during the 180 day statute of limitations period, or, indeed, the continuation of that silence during the six years between passage of the Settlement Act and the filing of this lawsuit, despite the occurrence of this series of events which could reasonably have been expected to alert them to the need to take some action to assert or protect their rights. The Court accordingly finds that the 180 day statute of limitations is constitutional, and that plaintiffs' constitutional challenges to the Settlement Act are time barred, and the Court does not address defendants' substantive arguments in favor of dismissal of Counts Five and Six.

### 2. Tribal recognition

Finally, the Federal Defendants have moved to dismiss Count Seven, which seeks judicial recognition as a federally-recognized tribe, for failure to exhaust administrative remedies.

In *Golden Hill Paugussett Tribe v. Weicker*,[82] the Second Circuit held that the doctrine of "primary jurisdiction" required determination by the BIA of whether the Golden Hill Paugussett Indians qualified as a federally-recognized tribe before the district court could rule on the tribe's land claim suit (which also depended on tribal status). "Primary jurisdiction and exhaustion of administrative remedies are both 'concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' "[83]

In contrast, the exhaustion of administrative remedies doctrine "holds that a litigant must generally pursue all available administrative remedies before seeking judicial review of an administrative action."[84] The doctrine relies on the theory that "it is better to allow an agency to employ its expertise first in developing the facts,"[85] and applies when "a claim is cognizable in the first instance by an administrative agency alone."[86]

Here, because the relief sought by NAM is *precisely* the relief which could otherwise be afforded by the BIA, exhaustion of administrative remedies provides the appropriate analysis. As the Second Circuit noted in *Golden Hill*, "the BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether [a tribe] meets the criteria for tribal status. This is a question at the heart of the task assigned by Congress to the BIA and should be answered in the first instance by that agency."[87]

**82.** 39 F.3d 51 (2d Cir.1994).

**83.** *Id.* at 59 (*quoting United States v. Western Pac. R.R.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

**84.** *Id.; accord Touche Ross & Co. v. SEC*, 609 F.2d 570, 574 (2d Cir.1979).

**85.** *Golden Hill*, 39 F.3d at 59.

**86.** *United States v. Western Pac. R.R.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

**87.** 39 F.3d at 60 (*citing Chicago Mercantile Exch. v. Deaktor*, 414 U.S. 113, 114–15, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973) (per curiam)).

Similarly, in *James v. United States Department of Health and Human Services,* the D.C. Circuit observed:

> the Department has been implementing its regulations for eight years and . . . it employs experts in the fields of history, anthropology and genealogy, to aid in determining tribal recognition. This, in our opinion, weighs in favor of giving deference to the agency by providing it with the opportunity to apply its expertise. Moreover, the factual record developed at the administrative level would most assuredly aid in judicial review should the parties be unsuccessful in resolving the matter; in the event that the dispute is resolved at the administrative level, judicial economy will be served. All of these facts weigh in favor of requiring exhaustion in this case.[88]

Here, NAM argues that the Court should not require it to proceed through the administrative channels because the Court will be required to determine whether NAM is a tribe in the sovereign immunity context or in assessing whether the challenges to the Settlement Act were ripe in 1994. However, the Court is not in fact required to do so, and this provides no basis for ignoring the doctrine of primary jurisdiction. Alternatively, NAM alleges that in the event the Court were to declare that the Settlement Act has not extinguished its land claims, it would then be subject to additional delay because any land claim suit would be stayed while the tribe sought federal recognition, and that judicial economy—and the possibility of prejudicial delay—supports this Court timely deciding all issues at once and then permitting a single appeal to the Second Circuit.

However, although NAM represents that it has now requested that its petition be placed on active status by the BIA, it has not given any reason why it waited until January 30, 2001 to do so, particularly as the original petition (under the name of "Mohegan Tribe and Nation, Inc.") was filed in 1993, and the BIA issued recognition of MTIC in 1994. Thus, much of the delay suffered by NAM to date is due to NAM's own unexplained delay in moving to have its petition placed on active status, and cannot fairly be characterized as prejudicial.

Under these circumstances, the Court finds no basis to depart from the principles of exhaustion of administrative remedies recommended by the Second Circuit in *Golden Hill.*[89] Accordingly, Count Seven is dismissed.

## IV. Conclusion

For the reasons discussed above, the defendants' motions to dismiss [## 25, 28, 30] are GRANTED.

The Clerk is directed to close this case.

IT IS SO ORDERED.

---

**88.** 824 F.2d 1132, 1138 (D.C.Cir.1987).

**89.** 39 F.3d at 60.